# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BRK BRANDS, INC., and
GARY J. MORRIS, PH.D.,

|  |  |
|---|---|
| Plaintiffs, | Civil Action No.: 13-cv-7900 |
| v. | Honorable Richard A. Posner |
| NEST LABS, INC., | |
| Defendant. | |

## DEFENDANT NEST'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.     Controlling Legal Principles ..................................................................................1

II.    The Morris Patents ('310, '424, '798, '040 and '780 Patents) ...............................1

     A.    "Predetermined silent intervals" / "time intervals" / "periods of silence"...............3

     B.    Emitting voice messages in "respective silent intervals" / "periods of silence"...................................................................................................8

     C.    Location and Language Selection Members, Elements and Circuits ...................11

     D.    Selector/Settable Element to Select Radio Frequency...........................14

     E.    "Control electronics" / "control element" / "electronic circuit" ...........................15

     F.    Wired "interconnecting" ...................................................................................17

     G.    "A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm" ..........................................................19

III.   The Devine Patent ('182 Patent).........................................................................21

     A.    "[Substantially] symmetrical in-flow and out-flow" .............................................22

     B.    "substantially planar flow path through the housing" ...........................................23

## TABLE OF AUTHORITIES

### CASES

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007)....................................7

*Apple Inc. v. Motorola, Inc.*, 2012 U.S. Dist. LEXIS 67384 (N.D. Ill. Mar. 19, 2012) ...............6, 14

*Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014)...............................19, 20

*AquaTex Indus., Inc. v. Techniche Solutions.*, 419 F.3d 1374 (Fed. Cir. 2005) ..............................13

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328 (Fed. Cir. 2008)..........20, 21

*Bell Atlantic Network Servs., Inc. v. Covad Comm'ns Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) .....................................................................................................................................22

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006) ........................................................24

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004).............................................6

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361 (Fed. Cir. 2012) ............22

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ........................7

*Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322 (Fed. Cir. 2009) .......................................4

*Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) ........................................20

*Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998)..........................................5

*In re Katz Interactive Call Processing Patent*, 639 F.3d 1303 (Fed. Cir. 2011) .................19, 20, 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ......24

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ........................................................18

*Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) ............................. passim

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004)...................................1, 5

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545 (Fed. Cir. 1996)...................9

*Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) ............................................................12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) .....................1

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ...........................................5, 7

*Ormco Corp. v. Align Tech., Inc.*, 498 F. 3d 1307 (Fed. Cir. 2007)...........................................12, 16

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .......................................................... passim

*Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed. Cir. 2002) ..........................................................1, 5

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) ........................14

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)............................................16

*Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999)...............................9, 11

*WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999).........................................20

## STATUTES AND RULES

35 U.S.C. § 112, ¶ 6.........................................................................................................14, 19, 20

## TABLE OF ABBREVIATIONS

| Exh. No. | Document Description | Abbreviation |
|---|---|---|
| **Joint[1] - A** | U.S. Patent No. 6,144,310 (BRK_000001 – BRK_000015) | '310, [Col.]: [ll-ll] |
| **Joint - B** | File History of U.S. Patent No. 6,144,310 (BRK_000016 – BRK_000191) | BRK_[xxxx-xxxx] |
| **Joint - C** | U.S. Patent No. 6,323,780 (BRK_000192 – BRK_000207) | '780, [Col.]: [ll-ll] |
| **Joint - D** | File History of U.S. Patent No. 6,323,780 (BRK_000208 – BRK_000376) | BRK_[xxxx-xxxx] |
| **Joint - E** | U.S. Patent No. 6,377,182 (BRK_000377 – BRK_000383) | '182, [Col.]: [ll-ll] |
| **Joint - F** | File History of U.S. Patent No. 6,377,182 (BRK_000384 – BRK_000446) | BRK_[xxxx-xxxx] |
| **Joint - G** | U.S. Patent No. 6,600,424 (BRK_000447 – BRK_000460) | '424, [Col.]: [ll-ll] |
| **Joint - H** | File History of U.S. Patent No. 6,600,424 (BRK_000461 – BRK_000685) | BRK_[xxxx-xxxx] |
| **Joint - I** | U.S. Patent No. 6,784,798 (BRK_000686 – BRK_000698) | '798, [Col.]: [ll-ll] |
| **Joint - J** | File History of U.S. Patent No. 6,784,798 (BRK_000699 – BRK_000823) | BRK_[xxxx-xxxx] |
| **Joint - K** | U.S. Patent No. 7,158,040 (BRK_000824 – BRK_000836) | '040, [Col.]: [ll-ll] |
| **Joint - L** | File History of U.S. Patent No. 7,158,040 (BRK_000837 – BRK_0013) | BRK_[xxxx-xxxx] |
| **Nest[2] - A** | Excerpts from NFPA 72, *National Fire Alarm Code 1996 Edition*, National Fire Protection Association (Jul. 26, 1996) | Padro Decl., Ex. A |
| **Nest - B** | Excerpts from NFPA 720, *Recommended Practice for the Installation of Household Carbon Monoxide (CO) Warning Equipment 1998 Edition*, National Fire Protection Association (Jan. 16, 1998) | Padro Decl., Ex. B |
| **Nest - C** | Excerpts from ANSI S3.41-1990 (ASA 96-1990), *American National Standard Audible Emergency Evacuation Signal*, American National Standards Institute (Nov. 13, 1990) | Padro Decl., Ex. C |

---

[1] Refers to the parties' Joint Appendix, pursuant to Local Patent Rule 4.2, and its Exhibits.
[2] Refers to the Exhibits attached to Nest's separate appendix, attached as part of the Declaration of John P. Padro in Support of Defendant Nest's Opening Claim Construction Brief, dated May 5, 2014 ("Padro Decl.").

| Exh. No. | Document Description | Abbreviation |
|---|---|---|
| **Nest - D** | Excerpts from Webster's New World™ College Dictionary, Third Edition (1996) | Padro Decl., Ex. D |
| **Nest - E** | Excerpts from Millman and Taub, *Pulse, Digital, and Switching Waveforms: Devices and circuits for their generation and processing*, McGraw-Hill (1965) | Padro Decl., Ex. E |
| **Nest - F** | Excerpts from The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition (1996) | Padro Decl., Ex. F |
| **Nest - G** | Screenshot of DIP Switch from http://shop.rabtron.co.za/catalog/switch-spst-positions-p-1645.html?osCsid=rium80ih8kubl8vg0ukap2a1l0 | Padro Decl., Ex. G |
| **Nest - H** | Skylink® Wireless Keyless Entry User's Instructions (Model 88) (available at http://www.skylinkhome.com/88.ui.pdf) | Padro Decl., Ex. H |
| **Nest - I** | Excerpts from Roth, *Fundamentals of Logic Design*, Fourth Edition, PWS Publishing Company (1995) | Padro Decl., Ex. I |
| **Nest – J** | Excerpts from the Modern Dictionary of Electronics, Seventh Edition (1999) | Padro Decl., Ex. J |
| **Nest - K** | Excerpts from Webster's II New College Dictionary (1995) | Padro Decl., Ex. K |

Defendant Nest Labs, Inc. ("Nest") respectfully submits its Opening Claim Construction Brief for the terms listed in the Joint Claim Construction Chart, to be filed on May 19, 2014.

## I.      CONTROLLING LEGAL PRINCIPLES

Claim terms should be construed as they would be understood by one of ordinary skill in the relevant art at the time the application was filed, in view of the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  The specification "is highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (*citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Id.* at 1316 (*quoting Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 & 1251-53 (Fed. Cir. 1998)).  "No construction" or "'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Arguments and amendments made during prosecution "to overcome prior art can lead to narrow claim interpretations because '[t]he public has a right to rely on such definitive statements.'"  *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) (citations omitted); *see also Phillips*, 415 F.3d at 1317.  Claims cannot "cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO."  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).

## II.     THE MORRIS PATENTS ('310, '424, '798, '040 AND '780 PATENTS)

The Morris patents claim smoke and gas detectors that emit tonal pattern alarms and voice messages that describe the type and/or the location of the detected condition during silent

periods/intervals between groups of tones.  *See, e.g.*, '310, Abstract, 3:45-4:12; '780, 2:6-11.[3]

The Morris patents state that for the smoke and carbon monoxide tonal patterns:

> "[NFPA and UL] regulations…require a **maximum silence period between tonal alarm patterns of 1.5 seconds** (Ref UL2045, UL217, NFPA72 and NFPA 720). This period of time is sufficient for the **present invention** to verbally indicate the type and location of the sensed environmental condition but is unlikely to be useful to provide detailed instructions, as taught in the prior art, to occupants on how to respond to a hazardous condition."

'310, 3:2-10 (emphasis added); *see also* '310, 4:58-66.   The Morris patents and prosecution make clear that the required tonal patterns have a specific sequence and timing based on the then-existing standards.  The tonal pattern consists of three tones for smoke (*see, e.g.*, '310, Fig. 4 item 85) or four tones for carbon monoxide (*see, e.g.*, '780, Fig. 5 item 270)[4], each with a particular spacing between individual tones and a particular silent period/interval (i.e., off period) between groups of tones.   According to the Morris patents, the silent period is 1.5 seconds for smoke alarms and 5 seconds for carbon monoxide alarms.  *See, e.g.*, '310, Fig. 4; '780, Fig. 5; NFPA 72 (Padro Decl., Ex. A), pp. 72-106, section A.2.2.2.2 (for smoke tonal patterns); NFPA 720 (Padro Decl., Ex. B), p. 720-6, section 2.3.2.2 (for CO tonal patterns).

The Morris Patents disclose emitting voice messages describing the type (e.g., "smoke") and/or the location (e.g., "CO in utility room") of a detected condition consistent with the then-existing regulatory standards.  *See, e.g.*, '310, 4:19-24; *see also* '310, 3:59-4:1, 7:31-37; ANSI S3.41-1990 (ASA 96-1990) (Padro Decl., Ex. C) (expressly referenced by the NFPA 72

---

[3] The Morris Patents are all related.  The '424, '798 and '040 patents are all subject to a terminal disclaimer as to the '310 patent and share an identical specification; thus all cites for these four patents will be to the '310 patent.  The '780 patent, a continuation-in-part of the application that became the '310 patent, has a different specification, but incorporates the '310 patent by reference.  '780, 3:39-41.

[4] Nest refers to the '780 patent for the CO tonal pattern because, despite referencing the NFPA 720 guidelines, which require a 5 second silent period between groups of tones for CO, the figures of the '310 patent show only 1.5 second silent periods between groups of tones for CO. This was corrected to 5 seconds in the '780 patent in compliance with NFPA 720.

2

standard), p. 3, section 5.5 (disclosing, for example, the voice message "Fire! Get out!" between groups of tones). The Morris Patents also disclose emitting the same user-unalterable pre-stored voice message of alarm type and/or location in each silent period for a given alarm type. *See, e.g.*, '310, 1:63-2:7, 3:62-4:1, Figs. 4-6; '780, Figs. 3-7. During prosecution, Morris repeatedly relied upon this combination of user-unalterable voice messages and regulation-compliant tonal patterns to distinguish prior art. *See, e.g.*, BRK_000110-111, 115; BRK_000307, 325-326; BRK_000631-633, 635; BRK_000801-802, 804 (distinguishing prior art on these grounds); *see also* '310, 2:66-3:10, 3:21-39. The Morris patents further describe that "[u]ser selectable coding switches or jumpers permit the user to define the physical location of the single station within the dwelling," which corresponds to the location voiced by the pre-stored unalterable messages stored on the detector. '310, 4:25-27; *see also* '310, 7:67-8:8 & Fig. 7 (depicting use of jumper 117 to connect the boxes (pins 120) corresponding to "Basement"); '780, 4:59-64, 7:26-35 & Fig. 8. The Morris patents disclose the use of similar switches or wires (i.e., jumpers) to choose the language of voice messages. *See, e.g.*, '310, 6:22-24.

### A. "Predetermined silent intervals" / "time intervals" / "periods of silence"

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal[5] |
|---|---|---|
| "[tonal pattern includes][6] predetermined silent intervals" ('310: 14; '424: 1, 5; '798: 1; '040: 1) <br><br> "predetermined tonal silent periods" ('424: 37) <br><br> "[groups of tones are spaced apart by] silent, longer second time intervals" ('424: 7; '798: 19) | The silent intervals or periods between groups of tones for a given alarm type have the same duration. The maximum silent period is 1.5 seconds for smoke and 5 seconds for carbon monoxide | '310: 14; '424: 1, 5, 37; '798: 1; '040: 1; '780: 1, 4, 12: One or more silent periods of prescribed audible tonal patterns <br> '424:7; '798:19: <br> The time interval that occurs between groups of fire alarm |

---

[5] Plaintiffs originally proposed that no construction was necessary for any claim term and, as the Court noted, failed to offer any basis to conclude these phrases had different meaning. D.I. 135 at 2. Plaintiffs' multiple definitions that are clearly <u>not</u> based on the plain meaning are improper and should be rejected as inconsistent with the Court's order.

[6] Bracketed language is provided for context, but is not part of the term to be construed.

| "[some of the tones/groups of tones are spaced apart by a] first time interval [and wherein others of the tones are closer together]" ('424: 9; 780: 54)<br><br>"periods of silence [in the tonal pattern]" ('424: 24)<br><br>"periods of silence in said prescribed [audible tonal pattern]" ('780: 1, 12) | | indicating tones that is longer than the silent time period that occurs among the members of the groups<br><br>'424: 9; 780: 54: A time interval that is distinguished from a second or other time interval<br><br>'424: 24: A silent period |
|---|---|---|

The disputes here concern Plaintiffs attempt to ignore the patentee's repeated emphasis in his application and during prosecution that the spacing between groups of tones for a given alarm type was not variable and had certain maximum silent periods as derived from standards at the time the applications were filed.

The context of the claim language makes clear that, in each case, the disputed words refer to the silent intervals or periods between groups of tones (*see, e.g.*, '310, Fig. 4 (item 90); '780 Fig. 5 ("5 sec")) rather than the spacing between individual tones. *Phillips*, 415 F.3d at 1314 (context of surrounding claim language should be considered). The relevant claim passages are: '310 patent, 9:44-45; '424 patent, 9:39-42, 10:11-13, 11:61-63, 14:3-5, 8:25-28 & 8:64-67; '798 patent, 8:23-26 & 9:38-40; '040 patent, 8:29-43; '780 patent, 8:62-64, 10:4-6 & 14:4-7; *see also* Nest's Response to Plaintiffs' Motion to Enforce the Court's Order, D.I. 131 at pp. 2-3. Applicants also referred to these as "intergroup silent intervals." *See* BRK_000109-110.

The Morris patents disclose that these silent periods have the same duration for a given alarm type and define a maximum duration for such silent periods. Throughout the patents and the prosecution, the applicant repeatedly used the limited duration of the silent intervals or periods in the tonal pattern as a basis to distinguish prior art. Plaintiffs cannot now ignore the specification and the prosecution history and recapture that subject matter under the guise of "plain meaning." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009)

(statements in the specification disavowed "resilient wires" by disparaging prior art "resilient wires"). *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003) (allowing patentees to "recaptur[e] through claim interpretation specific meanings disclaimed during prosecution" would defeat "the public notice function" and "the public's reliance on definitive statements made during prosecution"); *Rheox*, 276 F.3d at 1325 (accord); *Microsoft*, 357 F.3d at 1349 (accord).

Because Morris sought expedited examination for the '310 patent through a Petition to Make Special, he was required to explain how his invention was allegedly different from the known prior art. *See* BRK_000076-77 (Petition under MPEP § 708.02 referencing discussion in the specification distinguishing prior art). In doing so, Morris explained:

> ***All known prior art*** providing user-recorded verbal instructions on how to escape a hazardous condition has become impractical for use in dwellings in view of the recent National Fire Protection (NFPA) and Underwriters Laboratories (UL) regulations that require a ***maximum silence period between tonal alarm patterns of 1.5 seconds*** (Ref UL2045, UL217, NFPA72 and NFPA 720). This period of time is sufficient for the ***present invention to verbally indicate the type and location of the sensed environmental condition but is unlikely to be useful to provide detailed instructions, as taught in the prior art,*** to occupants on how to respond to a hazardous condition.

'310, 2:66-3:10. Such statements in a Petition to Make Special are limiting. *See, e.g.*, *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1475 (Fed. Cir. 1998) (statement with Petition to Make Special distinguishing a prior art "drop down tray" was outside the scope of the patent).

Morris made further limiting statements throughout the patent. In the "SUMMARY OF INVENTION," Morris explained: the "***invention*** . . . emits the ***prescribed*** audible tonal pattern alarm in accordance with the industry's empowered governing bodies' [NFPA and UL] criteria for such environmental conditions." '310, 3:45-55 (emphasis added). Later, in the "OBJECTS AND ADVANTAGES OF THE PRESENT INVENTION" Morris explained: "A major advantage of . . . ***the present invention*** is the use of factory pre-recorded voice messages that fit

5

within the [NFPA] and [UL] *specified 1.5 second silence period*." '310, 4:55-59 (emphasis added); *see also* NFPA 72 (Padro Decl., Ex. A), p. 72-106, section A.2.2.2.2 ("The *standard fire alarm evacuation signal is* a three pulse temporal pattern . . . followed by an off phase (c) lasting *1.5 seconds ± 10 percent*").[7]   Consistent with the NFPA 72 code, Morris used the same 1.5 second silent interval between groups of tones for the smoke detector signals.  *See* '310, Figs. 4 & 5 (depicting 1.5 second silent intervals); 7:27-35 & 7:38-49 ("*defined* silence periods of the *prescribed* audible tonal pattern" in Figs. 4 and 5, respectively) (emphasis added).  With respect to carbon monoxide alarms, the NFPA 720 code indicates that "[t]he audible alarm signal for carbon monoxide alarms should be a single tone pattern consisting of 4 cycles. . . followed by *5 seconds ± 10 percent off*." (Padro Decl., Ex. B), p. 720-6, section 2.3.2.2.  Figures 3, 4, and 6 of the '780 patent depict constant silent periods of 1.5 seconds for smoke whereas Figures 5 and 7 of the '780 patent (which correct the earlier '310 patent CO figures) depict constant silent periods of 5 seconds for carbon monoxide.  Like the '310 patent, the '780 patent again refers to these as the "*defined* silence periods of the *prescribed* audible tonal pattern."  *See* '780, 6:46-51 (emphasis added); *see also* 6:55-59, 7:16-19.  The patentee's emphasis of the "present invention" and the constant and maximum time interval between groups of tones for a given alarm type, as required by the NFPA and UL standards, controls the construction of this term.  *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 2012 U.S. Dist. LEXIS 67384, at *26 (N.D. Ill. Mar. 19, 2012) (J. Posner) (prefatory clause "the present invention" means "every incarnation of the invention") (*citing Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006)); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole . . . are more likely to support a limiting definition of a claim term.");

---

[7] Nest would not exclude slight variations of ± 10 percent as permitted by the NFPA guidelines.

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (construction must be consistent with what the "the specification stresses that the invention is"); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1366-68 & 1370 (Fed. Cir. 2007). Here, these statements in the patent mandate adopting Nest's proposed construction.

Further, during prosecution, the patentee disclaimed the use of tonal patterns with variable silent periods/intervals as "unlike the claimed invention." *See, e.g.*, BRK_000110-111 ("Such messages and tonal patterns [in Fray] are ***variable*** (Col. 5, lines 35-38, Fray) and ***unlike the claimed invention*.") (emphasis added); *see also* BRK_000111 ("use of the ***fixed*** NFPA and UL alarm tone patterns would not be practical in Fray's system") (emphasis added).  Indeed, the patentee distinguished the cited prior art on the grounds that "only Applicant's invention . . . maintain[s] safety and compliance with UL and NFPA standard tonal alarm patterns" which "allow only 1.5s of silence in the tonal pattern for smoke detector units." *See* BRK_000111; *see also* BRK_000115 ("Applicant alone has recognized the value and importance of using ***constant***, user unalterable tonal patterns in combination with user unalterable alarm type messages, or location messages audibly presented in intervals of silence within the respective ***fixed*** tonal pattern.") (emphasis added). Such statements amount to an express disavowal of claim scope, which excludes longer or varying silent intervals between groups of tones for a given alarm type. *Phillips*, 415 F.3d at 1317; *Omega*, 334 F.3d at 1323-24; *see also Andersen Corp.*, 474 F.3d at 1368 ("prosecution history of [a] parent application is 'highly instructive'").

Only Nest's proposed construction aligns with the claim language and how the applicant described the alleged invention both in the specification and during prosecution.  Thus, all of the above claim language that indisputably refers to silent intervals or periods between groups of tones should be construed to mean that such periods or intervals are of the same duration for a

given alarm type, and a maximum of 1.5 seconds for smoke and 5 seconds for carbon monoxide.

**B.  Emitting voice messages in "respective silent intervals" / "periods of silence"**

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "outputs . . . an interleaved … [message] in a respective silent interval" ('310: 14; '040: 1)<br><br>"emits … [message(s)] in respective silent intervals" ('424: 1, 5; '798:10)<br><br>"[message] . . . emitted in respective silent intervals" ('798: 1)<br><br>"injects … [fire indicating word] into only the second time intervals [between groups of tones]" ('424: 7; '798: 19)<br><br>"emits … [voice message] . . . during the periods of silence" ('424: 24)<br><br>"[voice message] . . . is emitted during periods of silence" ('780: 1) | The same verbal message (of alarm type and/or location) is announced during each intergroup silent period | <u>'310: 14; '040: 1</u>: Outputs an audio representation of a respective one of the tonal patterns with an interleaved respective verbal alarm type message in a respective silent interval<br><br><u>'424: 1, 5; '798: 10</u>: Emits the audible tonal pattern and respectively emits the verbal alarm-type message in respective silent intervals<br><br><u>'798: 1</u>: The selected location message to be repetitively emitted in respective silent intervals<br><br><u>'424: 7; '798: 19</u>: Injects the stored fire indicating word into only the second time intervals between groups of fire alarm indicating tones<br><br><u>'424: 24; '780: 1</u>: Emits/[ted] during a silent period |

The dispute here concerns whether the above claim phrases can properly be interpreted to mean anything other than the same message is played in each intergroup silent period. The answer is no because any other construction contradicts the claim language and specification.

The plain words of the claims show that the same message is announced/emitted during each intergroup silent period. *Phillips*, 415 F.3d at 1314 (claim context is instructive). The first three phrases listed above refer to playing the messages in "respective silent intervals." The words themselves indicate that the same message (whether it includes the type of alarm, location of detection or both) is played in each silent period. *See* Webster's Dictionary (Padro Decl., Ex. D), p. 1143 (defining "respective" as "relates individually to each of two or more persons or things"). The fourth phrase refers to injecting the fire-indicating word into only the second time

intervals and likewise means that word is injected between the groups of tones. The final two phrases refer to emitting/playing the voice message "during periods of silence." In the context of the claims, the periods of silence are indisputably the periods between groups of tones. Thus, the claims call for emitting the same message during the periods of silence for a given alarm.

Moreover, Nest's proposed construction is consistent with the patents, which only describe and potentially enable a system or method wherein the same voice message is played in each silent period for a given alarm type. *Phillips*, 415 F.3d at 1318; *see also Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1392 (Fed. Cir. 1999) (the scope of the claims must be limited to "[t]he only system that is described and enabled"); *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("when the preferred embodiment is described as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment"). The "SUMMARY OF INVENTION" explains that the recorded message is emitted simultaneously and occurs during the silent periods in the tonal pattern. '310, 3:59-62. The patent then identifies four examples, each of which discloses emitting the ***same*** message (of alarm type, location or both) in every silent period between groups of tones for a given alarm. *See* '310, 3:64-4:3 (repeating "SMOKE" in all intergroup silent intervals "in a periodic manner"); *see also* '310, 4:3-6 ("CO"); 4:5-8 ("Smoke in Basement"); 4:9-13 ("Utility Room"). Every embodiment in the asserted patents discloses emitting the same verbal message during all intergroup silent intervals or periods. *See, e.g.*, '310, Figs. 4-6 (repeating the same voice message 90, 100 and 110 during all intergroup silent periods); Fig. 4 and 5 (below with red boxes added); 7:29-35, 7:41-47 & 7:52-60 ("***a*** recorded ***voice message*** [90 / 100 / 110] . . . is inserted into the defined silent periods") (emphasis added).



Fig. 4          Fig. 5

Further, playing the same verbal message in each intergroup interval is the only construction disclosed or even possibly enabled by the written description. Specifically, the '310 patent and its progeny disclose a monostable multivibrator circuit for triggering the announcement or emission of voice messages. '310, Figs. 2 and 3 (item 21); 6:45-61. The "sensor and alarm unit 10 connects to interface and control unit 20 to trigger the monostable multivibrator 21 for a predetermined period of time when an environmental condition is detected" that, in turn, enables the "electronic voice memory integrated circuit 31 to emit a recorded voice message." '310, 7:8-15. A monostable multivibrator is a discrete hardware device that, when triggered, generates a single output pulse—hence they are called "one-shot" devices. *See* Millman and Taub (Padro Decl., Ex. E), p. 404 (describing "monostable circuit" as a "one shot," "single-cycle" or "single-step circuit" requiring "a triggering signal" and "generat[ing] a rectangular waveform"). Such a device is not in itself capable of providing an output for only some of the intergroup silent periods. Similarly, the voice memory IC 31 (*see, e.g.*, Figs. 2 and 3) is a discrete hardware device that merely stores the voice message (types and/or locations) and must be triggered by the monostable multivibrator to emit such messages. '310, 7:12-14; 6:49-61. There is simply no disclosure or suggestion in the specification or the disclosed circuitry that would allow for playing (i) a message during only some of the intergroup

silent periods or (ii) different voice message for the same alarm event. When an environmental condition is detected, the alarm unit 10 always triggers the monostable multivibrator ('310, 7:8-11), which enables the playing of the same voice message during each silent interval between groups of tones (i.e., it cannot skip silent periods).

The '780 patent reinforces the patentee's intent to require that the same message be repetitively emitted during all intergroup silent intervals. '780, 5:3-5 ("a voice playback indicating "First Floor" or "Smoke on First Floor", "Fire", "Fire First Floor" or the like, **with periodicity**") (emphasis added); 5:10-11 ("voice playback indicating "Second Floor" or "Smoke on Second Floor" **with periodicity**") (emphasis added); 6:58-60 ("**the** verbal alarm message 220 is output **repetitiously** during the 1.5 second silence interval") (emphasis added); *see also* Figs. 3-7 (emitting the same verbal message of alarm type and/or location during each silent interval).

Accordingly, these terms, as properly construed and reflected in Nest's proposal, require that the same message be played during all silent periods for a given alarm because that is all the patents describe and even possibly enable. *Wang Labs.*, 197 F.3d at 1392; *see also Phillips*, 415 F.3d at 1313 (a proper construction comports with the "context of the entire patent, including the specification").

### C. Location and Language Selection Members, Elements and Circuits

| Claims (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "manually settable [location] specifying member [. . . whereby a user can specify a location]" ('424: 9)<br><br>"selectable coding element [to define each detector's installation location]" ('424: 24)<br><br>"selectable coding circuitry [to define the installation location]" ('780: 1)<br><br>"circuitry to provide for the selection of [language type presentation of said pre- | User positionable hardware switch(es) or wire(s) (e.g., jumper(s)) and associated circuitry [for setting location or language, respectively] | '424: 9, 24; '780: 1, 4, 12: Hardware and/or programmable circuitry for user selection of [location / language type]<br><br>'780: 27: Programmable circuitry [to define a voice information code] |

| Claims (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| recorded messages]" ('780: 4) | | |
| "circuit to provide for the selection of [language-type presentation]" ('780: 12) | | |
| "alarm code selector [to define a voice information code]" ('780: 27) | | |

The dispute here concerns Plaintiffs' disregard of the patents' description in an attempt to expand these limitations to encompass anything that might perform the recited function of selecting a location or language, including software not on the detectors themselves.[8]  In contrast, Nest's proposed construction flows directly from the patents' limited disclosure of positionable hardware switches or wires to select a location or language.  *See Mass. Inst. of Tech. v. Abacus Software* (*MIT*), 462 F.3d 1344, 1356-57 (Fed. Cir. 2006) (limiting "circuit" to hardware, not software, based on plain meaning and description in specification); *see also Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1143-46 (Fed. Cir. 2005) (limiting "board" to "wood cut from a log" based on context of specification) (*citing Phillips*, 415 F.3d at 1321).  In each phrase above, the terms to be construed ("member," "element," "circuit," "selector") and other words in the claim clearly refer to a structural component on the detector that permits a user to make a selection of the detector location or language.  *See, e.g.*, '424, 9:61 (claim 9 - "a first detector having"); '780, 8:50 & 9:59 (claims 1 & 12 – "each . . . detector comprising");[9] *Phillips*, 415 F.3d at 1314 (context of surrounding words in the claims must be considered).

The specification provides the appropriate guidance to determine the scope of these functionally worded limitations.  *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307,

---

[8] In Plaintiffs' infringement contentions Plaintiffs attempt to point to ***software*** operating on a user's mobile device, not the detector, as meeting these claim limitations.

[9] In the context of the '780 patent, the "voice information code" is data defining a particular location-specific voice message, which is transmitted from a detector so that the corresponding location voice message is emitted by detectors receiving the voice information code.  *See, e.g.*, '780, 4:16-23; 4:59-5:13.

1316 (Fed. Cir. 2007) (limiting a functional claim to the disclosure in the specification); *AquaTex Indus., Inc. v. Techniche Solutions.*, 419 F.3d 1374, 1380-82 (Fed. Cir. 2005) (accord); *see also MIT*, 462 F.3d at 1356-57. The Morris Patents only disclose hardware switches (DIP switches) or wires ("jumpers") to select location or language: "selection" circuits ((50) for location and (60) for language in Fig. 1 (below)) are implemented using a "jumper set or selector" or "DIP switch" on the detector. *See, e.g.*, '310, 6:19-24, 6:65-7:2, Figs. 1 (below left), 7 (below right "Basement" selected by connecting jumper 117 to two points).



Further, as stated in the "Objects and Advantages of the Present Invention": "User-selectable coding switches or jumpers permit the user to define the physical location of the single station unit within the dwelling." '310, 4:25-27. As the Morris Patents further explain, for those embodiments of the ***invention*** that require identifying a location, "***selectable coding apparatus 50 (jumper selector or DIP switch)*** which connects to the interface and control unit **20** is provided to select one of the several predefined locations" and the selection corresponds to a "[r]ecorded voice message. . . [of the] physical ***location[] consistent with the position of the selectable coding apparatus*** **50**." '310, 6:13-20 (emphasis added); *see also* '310, 3:11-24. This use of a jumper is consistent with the definition of "jumper" as a "crossconnection wire" in the IEEE Dictionary. IEEE Standard Dictionary (Padro Decl., Ex. F), at p. 562. DIP switches (right) are similarly well-known hardware that permits a user to position a "two-position switch . . . to control certain functions or to specify

13

particular operating characteristics." *Id.* at p. 290; *see also* Image of DIP Switch (Padro Decl., Ex. G).

These are not mere preferred embodiments, but rather are part of the "object of the present invention" and the sole disclosure that could impart any structure to these terms. *See Apple*, 2012 U.S. Dist. LEXIS 67384, at *26 (the prefatory clause "the present invention" means "every incarnation of the invention") (*citing Honeywell,* 452 F.3d at 1318); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (accord). Thus, Nest's construction—"user positionable hardware switch(es) or wire(s) (e.g., jumper(s)) and associated circuitry [for setting location or language, respectively]"—is the proper construction supported by the surrounding claim language and informed by the specification. Alternatively, if such terms are purely functional and without structure, they should be treated as § 112, ¶ 6 terms and limited to the specific structures of DIP switches/jumpers. *MIT*, 462 F.3d at 1353-55.

### D. Selector/Settable Element to Select Radio Frequency

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "selector to define a coded radio frequency signal" ('780: 27) "a settable system specifying element [coupled to the control circuit] for establishing a coded system specific identifier" ('780: 54) | User positionable hardware switch(es) or wire(s) (e.g., jumpers) and associated circuitry for selecting a unique code for wireless communications between detectors | '780: 27: User adjustable circuitry for selecting a code for radio communications between detectors '780: 54: User adjustable circuitry coupled to the control circuit for establishing a unique identity of the system |

Both constructions recognize that what is being set or selected is a unique code for wireless communications between detectors and that the code must be user settable or selectable. The main dispute concerns the structure of the "selector" or "settable system specifying element." As with location and language selection discussed immediately above, the '780 patent only discloses a physical switch or jumper (i.e., wire) that a user positions or sets to make the

selection.  *See, e.g.*, '780, 5:14-22 ("user-set switch" on address code selector 60 of Fig. 1).

Thus, for the same reasons as the preceding term, Nest's supported construction of "user

positional hardware switch(es) or wires (e.g., jumpers)" should be adopted.  *See* Section II.C,

*supra*.  By comparison, plaintiffs' user adjustable circuitry is vague, and encompasses software.

To the extent there are other differences between the proposed constructions, the context

provided by the specification makes clear that the user selectable "coded" signal or identifier is a

unique code that is transmitted between detectors when they communicate wirelessly.  *See, e.g.*,

'780, 2:33-41; 5:14-22; *see also* User's Instructions for Skylink Model 88 (Padro Decl., Ex. H).

The purpose of selecting the unique code is to avoid interference with other wireless devices in a

person's home or perhaps their neighbor's.  Without a user-selectable wireless code, the system

would be subject to spurious transmissions that might cause false alarms or block the reception

of an alarm.  *See* '780, 5:14-22.  Thus, Nest's proposed construction, which includes the phrase

"for selecting a unique code for wireless communications between detectors," should be adopted.

### E.  "Control electronics" / "control element" / "electronic circuit"

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "control electronics" ('310: 14; '424: 1, 5; '798: 1; '040: 1)<br>"control element" ('424: 7; '798: 19)<br>"electronic circuit" ('424: 37) | Discrete hardware elements that trigger the playing of voice messages during silent periods | '310: 14; '424: 1, 5, 7; '798: 1, 19; '040: 1: Hardware and/or programmable circuitry<br>'424: 37: Programmable circuitry |

The dispute here is whether these limitations ("control electronics," "control element,"

"electronic circuit") refer to hardware components, rather than software on a processor, that

trigger the playing of voice messages during the silent periods in a tonal alarm.

The common function of triggering the playing of voice messages during the silent

periods is reflected in each of the referenced claims for the "control electronics," "control

element" and "electronic circuit."  *See* D.I. 131 at 7 (citing the relevant claim language '310,

13:29-33 & '040, 8:36-40; '798, 8:34-37; '424, 8:37-39; '424, 9:9-13; '798, 9:42-44 & '424 9:45-48; '424, 14:5-8). Nest's proposed construction properly reflects that this common function is performed by discrete hardware elements, not software. Plaintiffs' construction could be interpreted to impermissibly seek to expand the plain meaning of the term beyond hardware components to include software, which is inconsistent with the specification and contradicts directly relevant Federal Circuit decisions. *See MIT*, 462 F.3d at 1356-57 (although "aesthetic correction circuitry" was not construed as a means-plus-function term, it was limited to hardware and did not encompass software implementations).[10] The *MIT* case is particularly instructive because the specification at issue stated that some computations could be performed by hardware or software. *MIT*, 462 F.3d at 1356-57. Despite this reference to software, the court in *MIT* concluded that "circuit" was limited to hardware because the reference to software "did not alter the specification's repeated description of the circuit itself as involving hardware." *Id.* Further, as with the selector limitations (*see* Section II.C., *supra*), these functionally claimed "control" elements/circuits must be construed consistent with the specification, which only discloses hardware for triggering the playing of voice messages during silent periods. *Id.*; *Ormco*, 498 F. 3d. at 1316 (limiting a functional term to the disclosure in the specification); *Phillips*, 415 F.3d at 1321 ("specification 'acts as a dictionary when it expressly defines terms . . . or when it defines terms by implication'") (citation omitted); *Vitronics*, 90 F.3d at 1582 (specification is "the single best guide to the meaning of a disputed term").

The patents confirm that these terms must be limited to hardware as the patents only describe the use of hardware components in connection with this function. The patents

---

[10] To the extent this Court were to conclude that any of these phrases lacks sufficiently definite structure, they would then be means-plus-function terms and limited to the only structure disclosed – the monostable multivibrator and/or frequency counter. *MIT*, 462 F.3d at 1353-55.

repeatedly refer to the Interface and Control Unit (20) that contains a "monostable multivibrator" (21) to control the timing of emitted voice messages "such that the recorded voice message[s] [are] emitted only during . . . a silent period." *See* '310, 5:63-6:2, Figs. 2 & 3 (depicting interface and control unit 20 and connections to monostable multivibrator 21); *see also* 6:45-61, 7:8-15. Additionally, the patents disclose that "an electronic frequency counter (not shown) [can be] used to determine when the silent periods of the audible alarm are occurring." '310, 6:3-5. Both the monostable multivibrator 21 and electronic frequency counter are discrete hardware components that do not have software programming. *See* Millman and Taub (Padro Decl., Ex. E), p. 404 (describing monostable multivibrator as a hardware device that requires a triggering signal to generate a pulse); Roth (Padro Decl., Ex. I), p. 298 (describing a "counter" as a hardware device "constructed from two or more flip-flops which change state…when input pulses are received"). Thus, the case for limiting these terms to hardware is even stronger than in *MIT* because the patents describe only discrete hardware elements and make no reference to software for the claimed function. Accordingly, the "control electronics," "control element" and "electronic circuit" must be limited to the "discrete hardware elements that trigger the playing of voice messages during silent periods" as proposed by Nest.

### F. Wired "interconnecting"

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
| --- | --- | --- |
| "interconnecting a minimum of two environmental condition detectors forming an environmental condition detection system . . . interconnected detectors" ('424: 24) | The detectors have a wired connection to each other for transmitting and receiving alarm signals | Creating a wired communication path between condition detectors |

This limitation must refer to a ***wired*** connection between detectors because the '424 patent disclaims wireless communication between detectors. '424:13-17 ("The present invention does ***not use wireless*** communication between detectors").

The remaining dispute concerns the signals sent between interconnected detectors. Unlike Plaintiffs' proposal, Nest's proposal is the proper construction as it comports with the surrounding claim language that indicates the wired connection is used to communicate alarm signals (indicating type and/or location). *Phillips*, 415 F.3d 1314. The claim makes clear that the very purpose of the wired connection between detectors is to ensure that "all other interconnected detectors emit substantially the same tonal pattern alarm and pre-recoded voice message." '424, claim 24, 12:3-5. Further, the patent explains that the "***present invention*** . . . compris[es] ***direct, hardwired communication links*** between a plurality . . . of detectors ***to provide a tonal pattern alarm with pre-recorded voice message information regarding the specific type of environmental condition detected or the specific location*** of the detector sensing the condition . . . ." '424, 3:12-20. This claimed functionality is achieved because the detectors transmit and receive coded alarm signals that specify the type and/or location of a condition. '424, 6:31-39 ("interconnecting, conductor set 80 ***sends and receives a coded electrical signal*** . . . [that] determines ***what specific recorded voice message*** is played . . . at the interconnected but remotely located environmental condition detectors") (emphasis added); 6:51-63 ("***send a coded electrical signal*** to the . . . interconnected detectors hardwired linked together through the conductor set 80 . . . to emit a recorded voice ***message verbally describing the location or type, or both, of the environmental condition*** sensed.") (emphasis added). Thus, Nest's construction should be adopted as it aligns with the surrounding claim language and the purpose of the wired connection to transmit and receive alarm signals (rather than just any wired connection). *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996) (adopting construction that comports with the "context of the entire patent, including the specification"); *see also Renishaw*, 158 F.3d at 1250.

G.     **"A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm"**

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "a processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm" ('780: 6, 16) | The term is governed by 35 U.S.C. § 112, ¶ 6: **Function:** "retrieving a selected tonal alarm pattern and presenting same to the audible alarm" **Structure**: The '780 patent fails to disclose supporting structure for a programmed processor, such as the steps or operations the processor performs to accomplish the recited function; thus, this claim is invalid as indefinite | This is not a means-plus-function claim limitation. A processor programmed with a set of instructions that receives input data and compares the input data to pre-selected threshold data values in memory for selecting tonal patterns indicative of a sensed condition and presents the selected tonal patterns to an audible alarm |

The parties dispute whether this term is governed by 35 U.S.C. § 112, ¶ 6.  The rebuttable presumption that § 112, ¶ 6 does not apply when a claim term does not include the word "means," may be overcome "if it is shown that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *MIT*, 462 F.3d at 1353-54 (Fed. Cir. 2006) (internal quotation marks omitted); *see also Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435, *4 (Fed. Cir. Apr. 25, 2014); MPEP § 2181(1).

Claims 6 and 16 recite a "processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm."  This merely recites a function for the processor rather than any particular steps or operations that would correspond to how the processor is programmed to accomplish the recited function.  Moreover, since the recited function is not a function that all processors could perform regardless of their programming, it cannot alone be sufficient structure.  *In re Katz Interactive Call Processing Patent*, 639 F.3d 1303, 1315-16 (Fed. Cir. 2011) (construing "processor" claims that recited functions that not all

processors perform as means-plus-function terms because they required disclosure of how the processor accomplished the functions recited in claims, while construing "processor" terms as not means-plus-function when the claims recited functions that all processors can perform); *see also WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328, 1334-35 (Fed. Cir. 2008) (disclosure of outcome was not disclosure of how a computer was programmed).

Where, as here, the claims do not provide sufficient structure, the Federal Circuit has instructed that it is proper to turn to specification to determine if it provides sufficient structure. *Apple*, 2014 WL 1646435 at *5-6. Here, the specification only describes the "processor" in generic terms that either repeat the functions in the claims or refer to unrelated functions (not cited here). *See, e.g.*, '780, 3:65-4:5 ("processor 30, in conjunction with instructions prestored in ROM, PROM, EEPROM 32 or the like could be programmed to make an alarm determination. … [P]rocessor 30 could select from one or more sets of tonal alarm patterns stored in memory unit 32, and use a selected pre-stored set to drive output transducer 22."); *see also* 5:47-57 (accord). These passages do nothing more than repeat the function of the claims. They do not indicate the "rules" or steps for how the output is achieved; thus, the processor term in these claims would not meet the requirements identified by the Federal Circuit in *Apple* as the basis to avoid means-plus-function treatment. *Apple*, 2014 WL 1646435 at *6-9 ("[t]he limitation's operation is more than just its function; it is how the function is achieved"); *In re Katz*, 639 F.3d at 1315-16. Thus, the "processor" terms are governed by § 112, ¶ 6, and should be limited to the disclosed algorithm (or steps and operations thereof) for performing the claimed functions. *See, e.g.*, *WMS Gaming,* 184 F.3d at 1348-49 ("the court erred by failing to limit the claim to the algorithm disclosed in the specification"); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323,

1340-41 (Fed. Cir. 2008) (disclosed structure cannot be a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm). Yet the specification discloses no corresponding structure. Instead, it simply repeats the function of the processor while providing no description of the algorithm for determining the desired tonal alarm and emitting that alarm. *See, e.g.*, '780, 3:65-4:5, 5:30-33, 5:46-57. Thus, claims 6 and 16 of the '780 patent are invalid as indefinite. *In re Katz*, 639 F.3d at 1315-16 (claim reciting a processor programmed to perform a specialized function was invalid as indefinite when patent did not disclose the "internal structure of that processor in the form of an algorithm"); *Aristocrat*, 521 F.3d 1334-37 (claim invalid as indefinite because repeating function or disclosure of processor with "appropriate programming" is insufficient structure to support means-plus-function term).

## III.    THE DEVINE PATENT ('182 PATENT)

The '182 patent concerns a smoke detector with a sensor protruding from a cover portion and located near a ceiling mounting surface to create an open, unobstructed airflow path through the detector. *See, e.g.*, '182, Abstract, 1:10-14, Fig. 2A-2C. The sensor is in the opening between the detector housing and the wall mounting, and the gap between the housing and wall mount is open to allow "symmetrical" and "planar" airflow. *See, e.g.*, '182, 2:44-60, 3:4-19; Figs. 2A, 2C (right) (sensor 40 highlighted and in /out-flow outlined by red boxes). This design permits "***flow unimpeded*** into and out of sensor 40 in a ***symmetrical fashion*** relative to the housing 32" such that "*[n]o special vanes or deflecting elements* are required . . . ." '182, 3:11-19 (emphasis added). This eliminates the need for vents or baffles. '182, 2:5-9.



### A. "[Substantially] symmetrical in-flow and out-flow"

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "substantially symmetrical in-flow and out-flow of ambient atmosphere" ('182: 1, 30) "facilitates a symmetrical inflow of ambient atmosphere into the sensor" ('182: 10) | The air flow paths are [substantially] the same from opposing sides and are not obstructed or redirected by other components, vanes or deflectors | Claims 1 and 30: [Housing provides] in-flow and out-flow of ambient atmosphere to and from the sensor in a substantially corresponding form Claim 10: [Housing] facilitates inflow of ambient atmosphere into the sensor in a corresponding form |

The dispute is whether Plaintiffs should be allowed to avoid the clear disclaimer in the '182 patent and proffer a vague construction. Nest's proposal defines the claimed airflow consistent with the intrinsic record and the common meaning of "symmetrical." *Phillips*, 415 F.3d at 1313 (*citing Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)).

Nest's construction is consistent with the only disclosure of "symmetrical" depicted in the '182 patent—as being the same from opposing sides (*see, e.g.*, Figs. 2A & 2C above). *See Phillips*, 415 F.3d at 1321 (*citing Vitronics*, 90 F.3d at 1582); *Bell Atlantic Network Servs., Inc. v. Covad Comm'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). Further, Nest's construction comports with the patent's (i) use of "symmetrical" to refer to omnidirectional flow ('182, 2:3-4) not obstructed by non-sensor components ('182, 3:60-64) and (ii) express disclaimer of directing vanes or deflectors ('182, 2:5-9 and 3:11-19). This disclaimer and the plain meaning of "symmetrical" exclude any devices specifically designed to redirect airflow as the airflows would not be symmetrical. *Phillips*, 415 F.3d at 1316 ("an intentional disclaimer, or disavowal, of claim scope . . . as expressed in the specification, is regarded as dispositive") *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) accord) (*citing Honeywell,* 452 F.3d at 1319). Nest's construction is also consistent with the common usage of "symmetrical" to mean "equal characteristics on each side of a central line, position, or value." Modern Dictionary of Electronics (Padro Decl., Ex. J) at p. 754.

22

In contrast, Plaintiffs' proposal ignores the express and implied definitions in the specification and replaces the word "symmetrical" with the even more confusing and ambiguous phrase "in corresponding form." Plaintiffs' proposed construction must be rejected as both uninformative and inconsistent with the intrinsic record.

**B.** **"substantially planar flow path through the housing**"

| Term (Patent: Claim(s)) | Nest's Proposal | Plaintiffs' Proposal |
|---|---|---|
| "for atmospheric ingress and egress with a substantially planar flow path [through the housing adjacent to the interior surface]" ('182: 20) | The entrance and exit flow paths lie largely in two dimensions and are not vertically deflected or displaced by other components, vanes or deflectors | Such that atmosphere enters and exits the housing substantially parallel to the housing [and adjacent to the interior surface] |

There are two disputes here. First, Nest's construction takes into account the '182 patent's express disclaimer of using vanes or deflectors, while Plaintiffs again ignore those statements. *See* '182, 2:5-9 & 3:11-19; *supra* Section III.A. Plaintiffs cannot now be permitted to ignore this very distinction the '182 patent made over the prior art. *Phillips*, 415 F.3d at 1316.

Second, the substantially planar flow path is defined at least by implication in the '182 patent consistent with the common meaning of the word planar to refer to a flow path that lies in two dimensions and has no substantial vertical component. *Phillips*, 415 F.3d at 1321. The '182 patent distinguished the prior art (referring to Figs. 1A-C which show a smoke path with a vertical component) as having vents or baffles to direct the smoke flow away from the ceiling (in a vertical direction) to the sensors. '182, 1:42-48. In contrast, the smoke flow (F1 and F2 in Fig. 2C below) through the housing of the alleged invention is not directed away from the ceiling and has no significant vertical component (illustrated by the red bar added "through the housing"), consistent with the claim's use of "planar." *See* '182, Figs. 3A and 3C. Nest's construction, based on understanding what the inventors purported to invent, is the proper construction. *Renishaw*, 158 F.3d at 1250. Nest's construction also aligns with the use of "planar" throughout

the patent and the common usage of the term. For example, the specification uses the word planar to refer to other features that are largely two dimensional, such as the "planar mounting element 42." *See, e.g.*, '182, 2:57-59. Nest's proposed construction that planar means in two dimensions is also consistent with the common meaning of the term. Webster's Dictionary (Padro Decl., Ex. K), p. 842 ("1. Of, pertaining to, or located in a plane. 2. Flat. 3. Having a two-dimensional characteristic").

Further, during prosecution, the applicants explained that the substantially planar flow path (without vertical deflection) is present because the smoke sensor extends into the planar path without requiring vertical deflection or direction. *See* Amendment, dated August 20, 2001, at pp. 5-8 (BRK_000428-430) (distinguishing the claimed invention from Rice) ("A ***fluid flow path*** is provided for atmospheric gases between the cover and the second surface. A ***substantially planar flow path is present between the second surface and the cover permitting a flow of atmospheric gases therethrough***. . . . ***A sensor carried by the cover extends into the flow path*** such that airborne gases and particulate matter flowing along the flow path can enter the respective sensor.") (emphasis added).

Rather than follow the guidance from the claims and specification, Plaintiffs' construction radically alters the meaning of the term it purports to construe by replacing "planar" with "parallel," a word that does not even appear in the '182 patent. Worse yet, Plaintiffs' proposal, which only requires that airflow enter and exit parallel to the housing, reads out the words of the claim that require the flow path to be substantially planar "through the housing." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("all claim terms are presumed to have meaning in a claim."); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye

toward giving effect to all terms in the claim"). Moreover, as shown by the arrows labelled F1 and F2 (Fig. 2C right) and "Smoke Flow" (Fig. 2A), the smoke flow is not planar as it enters and exits the housing.



FIG 2C

The flow must, however, be planar "through" the housing, as recited in the claims. Plaintiffs' construction that conflicts with both the claim language and the specification cannot be correct. *Renishaw*, 158 F.3d at 1250 (a proper construction "stays true to the claim language and most naturally aligns with the patent's description of the invention"). Plaintiffs' proposal that the flow path is "parallel to the housing" also makes no sense in the context of the '182 patent because the patent refers to the housing generally as item 32 in Fig. 2C, which has multiple parts and differently oriented surfaces, such as 32a and 32b. '182, 2:43-48. Thus, it is not even possible to reasonably explain how an air flow path might be "parallel" to such a multi-part, multi-surface structure.

DATED: May 5, 2014

Respectfully submitted,

/s/ Kevin X. McGann
_____

Kevin X. McGann
Jeffrey J. Oelke
John P. Scheibeler
John P. Padro
Vigen Salmastlian
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

John Letchinger
Baker & Hostetler LLP

191 North Wacker Drive
Chicago, IL 60606-1901
(312) 416-6206

*Attorneys for Defendant Nest Labs, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2014, I electronically filed the foregoing **DEFENDANT NEST'S OPENING CLAIM CONSTRUCTION BRIEF** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

By: */s/ John Letchinger*
_____

John Letchinger (#6207361)
Baker & Hostetler LLP
191 North Wacker Drive
Chicago, IL 60606-1901
(312) 416-6206

*One of the Attorney for Defendant Nest Labs, Inc.*