**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BRK BRANDS, INC., and
GARY J. MORRIS, PH.D.,

                        Plaintiffs,

        v.

NEST LABS, INC.,

                       Defendant.

Civil Action No.: 13-cv-7900

Honorable Richard A. Posner

**PLAINTIFFS BRK BRANDS, INC.'S AND GARY J. MORRIS, PH.D.'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................1

II. BACKGROUND .........................................................................................1

III. LEGAL STANDARDS ...............................................................................2

    A. General Claim Construction Principles ..............................................2

IV. THE DISPUTED CLAIM TERMS AND PHRASES ..................................3

    A. "manually settable [location] specifying member [. . . whereby a user can specify a location]" / "selectable coding element [to define each detector's installation location]" / "selectable coding circuitry [to define the installation location]" ..................................................................3

    B. "circuitry to provide for the selection of [language type presentation of said pre-recorded messages]" / "circuit to provide for the selection of [language-type presentation]" ..............................................................5

    C. "alarm code selector [to define a voice information code]" ('780: 27) ..................6

    D. "control electronics" / "control element" / "electronic circuit" ..............................6

        1. The Intrinsic Evidence Supports a Plain and Ordinary Meaning ................................................................................7

    E. "interconnecting a minimum of two environmental condition detectors forming an environmental condition detection system . . . interconnected detectors" ...................................................................10

        1. The Intrinsic Evidence Supports a Plain and Ordinary Meaning ................................................................................10

    F. "selector to define a coded radio frequency signal/a settable system specifying element [coupled to the control circuit] for establishing a coded system specific identifier" ..............................................................11

    G. "predetermined silent intervals" / "predetermined tonal silent periods" / "silent, longer second time intervals" / "first time interval" / "periods of silence" / "periods of silence in said prescribed" ....................................13

        1. The Intrinsic and Extrinsic Evidence Support a Plain and Ordinary Meaning ....................................................................14

        2. Nest's Proposal Violates the Doctrine of Claim Differentiation ..................................................................15

    H. "Outputs…an interleaved…in a respective silent interval/ "emits…in respective silent intervals"/"injects…into only the second time intervals"/ "emits…during the periods of silence"/ "… is emitted during periods of silence" ..................................................................16

        1. The Intrinsic Evidence Supports Adoption of Plain and Ordinary Meanings ....................................................................17

        2. Nest's Attempt to Globally Import Limitations is Incorrect .....................18

I.      "A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm" ............................................................19

      1.      This Claim Phrase is Not a Means-Plus-Function Limitation ...................19

J.      "substantially symmetrical in-flow and out-flow of ambient atmosphere" / "facilitates a symmetrical inflow of ambient atmosphere into the sensor"........................................................................................................................20

      1.      The Intrinsic and Extrinsic Evidence Supports a Plain and Ordinary Meaning ....................................................................................21

      2.      Nest's Proposal Is Unduly Narrow and Its Negative Limitation is Improper ..............................................................................22

K.      "for atmospheric ingress and egress with a substantially planar flow path [through the housing adjacent to the interior surface]" ..........................................23

      1.      BRK's Proposal is Consistent With the Plain and Ordinary Meaning ............................................................................................23

      2.      Nest's Proposal Is Unduly Narrow and Its Negative Limitation is Improper ..............................................................................24

V.      CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)..................................................................................2

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003)..................................................................................2

*Becton, Dickinson and Co. v. Tyco Healthcare Grp. LP*,
   616 F.3d 1249 (Fed. Cir. 2010)...........................................................................15, 18

*Ecolab, Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002)..................................................................................3

*Electro Med. Sys. S.A. v. Cooper Life Sci.*,
   34 F.3d 1048, 32 USPQ2d 1017 (Fed. Cir. 1994) ....................................................4

*Flo Healthcare Solutions, LLC v. Kappos*,
   697 F.3d 1367 (Fed. Cir. 2012)................................................................................19

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010)..................................................................................9

*GE Lighting Solutions, LLC v. Agilight, Inc.*,
   No. 2013-1267, slip op. at 5 (Ct. App. May 1, 2014)..............................................21

*Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*,
   649 F.3d 1350 (Fed. Cir. 2011)..................................................................................3

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005)..................................................................................3

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).........................................................................3, 4, 15

*Lighting World, Inc. v. Birchwood*,
   382 F.3d 1354 (Fed. Cir. 2004)................................................................................19

*Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006)............................................................................9, 10

*Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., Ltd.*,
   No. 2:09-cv-948, Dkt. No. 108 at 12 (E.D. Wis. Dec. 11, 2012) ...........................10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).................................................................................2, 22, 24

*Thorner v. Sony Computer Entm't. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................................23, 24

*TriMed, Inc.* v. *Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008).........................................................................................20

## Statutes

35 U.S.C. § 112, ¶ 6.......................................................................................................19, 20

## I.     INTRODUCTION

In arguing claim construction proposals clearly motivated by its litigation goals, Nest urges this Court to do one of three things:  (a) improperly import limitations into the claims from the specification, file history and (in some instances) thin air; (b) impermissibly impose common "global" constructions on numerous terms and phrases that clearly use different terms for distinct inventive concepts; and (c) completely disregard the plain meaning of the terms and phrases that is clearly supported by the intrinsic record.  To that end, Nest's constructions attempt to redraw the metes and bounds of the claims, improperly import narrowing limitations in some instances and impermissibly broadening the claims in others.  Because Nest's proposed constructions are not supported by the plain language of the claims, the specifications, or the file histories, the Court should reject them and construe the claim terms consistent with their plain and ordinary meanings or, alternatively, decline to construe many of the non-technical terms at all.

## II.     BACKGROUND

Plaintiffs allege that Nest infringes U.S. Patent Nos. 6,144,310 ("the '310 patent"); 6,600,424 ("the '424 patent"); 6,323,780 ("the '780 patent"); 6,784,798 ("the '798 patent"); 7,158,040 ("the '040 patent"); and 6,377,182 ("the '182 patent") (collectively, "Patents-in-Suit"). The '310 patent, the '424 patent, the '780 patent, the '798 patent, and the '040 patent (collectively, "Morris Patents") are related and generally disclose "an environmental condition detector using both tonal pattern alarms and pre-recorded voice messages to indicate information about the environmental condition being sensed."  *See, e.g.*, Joint Claim Construction Appendix ("J.A.") (Dkt. 143), Exh. A at Abstract.  "The pre-recorded voice messages describe the type of environmental condition detected or the location of the environmental condition detector sensing the condition, or both, in addition to the tonal pattern alarm."  *Id.*

1

BRK engineers developed the technology of the '182 patent in-house. The '182 patent discloses a smoke alarm where the sensor(s) are located near the mounting surface, allowing atmosphere to flow unimpeded to the sensor. This technology outperforms prior smoke detectors, in part, because the flow of atmosphere nearest the mounting surface is most reliable for determining whether alarm conditions are present.

## III. LEGAL STANDARDS

### A. General Claim Construction Principles

Plaintiffs largely agree with Nest's discussion of the legal standards applicable to claim construction. Although Nest correctly recites the law, it fails to properly recognize and apply four principles particularly controlling in this case.

First, claim construction always begins with the language of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc) ("[T]he context in which a term is used in the asserted claim can be highly instructive."). Likewise, other claims of a patent may inform the scope and meaning of disputed claim language. *Id.* at 1314. To be sure, the heavy presumption in favor of plain and ordinary meaning "may be overcome where the patentee chooses to be his or her own lexicographer by clearly setting forth a definition for a claim term in the specification" or where there is clear disavowal of claim scope. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).

Second, under the doctrine of claim differentiation, when one claim does not recite a particular limitation that is recited in another claim, "that limitation cannot be read into the former claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003). The presumption that each claim is different in scope "is especially strong where there is a dispute over whether a limitation found in a dependent claim should be read into an

independent claim, and that limitation is the only meaningful difference between the two claims." *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002).

Third, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005).

Fourth, where the claim language does not recite the term "means," the Court should presume that the limitation does not invoke § 112, ¶ [f]. *Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011). To overcome that presumption, a party must "demonstrate[] that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.*

## IV. THE DISPUTED CLAIM TERMS AND PHRASES

In the event that the Court determines that any construction of any of the disputed terms/phrases is even necessary, there is no compelling reason to depart from the plain and ordinary meaning of the words used in the claims.

### A. "manually settable [location] specifying member [. . . whereby a user can specify a location]" / "selectable coding element [to define each detector's installation location]" / "selectable coding circuitry [to define the installation location]"

| Disputed Terms | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "manually settable [location] specifying member [. . . whereby a user can specify a location]" ('424: 9) | hardware and/or programmable circuitry for user selection of location | User positionable hardware switch(es), wire(s) (e.g., jumper(s)) and associated circuitry [for setting location or language, respectively] |
| "selectable coding element [to define each detector's installation location]" ('424: 24) | | |

| "selectable coding circuitry [to define the installation location]" ('780: 1) | | |
|---|---|---|

There is no technical or patent jargon in these disputed phrases that warrant the adoption of any construction, much less Nest's narrow proposed construction. One skilled in the art (and lay jurors alike) can understand the claims and the Court should construe them consistent with their plain meaning: "hardware and/or programmable circuitry for user selection of location."

The '424 specification discloses a "selectable coding apparatus" used to select "one of several predefined physical locations of the environmental condition detectors within a residence." J.A., Exh. G at 6:16-18; *see also* fig. 1 element 50, 4:27-29, 6:66-7:2. Nest's narrow construction is an attempt to confine the claims to preferred embodiments such as switches and jumpers. Nest Labs, Inc.'s Opening Claim Construction Brief ("CC Brief") (Dkt. 141) at 13. The law is clear that it is improper to import limitations from a preferred embodiment into the claims "absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co.*, 358 F.3d at 913. Nest cites no such "clear indication" and none exists.

Specifically, there is no intrinsic record support for Nest's assertion that the claims should be limited to the preferred embodiment. To the contrary, while the '424 specification makes references to switches or jumpers, the claims deliberately use the broader terms "member" and "element." *See Electro Med. Sys. S.A. v. Cooper Life Sci.*, 34 F.3d 1048, 1054, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994) ("Particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").

In a similar vein, the '780 specification discloses a "user-set dip-switch/jumper arrangement that enables the user to define the location voice information." J.A., Exh. C at 4:59-

61. The specification, however, goes further as it also discloses "preset switches or manually settable elements for the user to manually select verbal information." *Id.* at 7:54-55.

The specification also describes the "location code selector" more generally, by its functions. J.A., Exh. C at 4:64-65 ("[t]he location code selector 50 programs the transmitter 40 to transmit the coded signal"); 5:6-11 ("[d]etectors located on the second floor of a dwelling may be set by the location code selector 50 to transmit a wireless signal to all other detectors…for the detector type plus a voice playback indicating 'Second Floor' or 'Smoke on Second Floor' with periodicity"); *see also* fig. 1 element 50. The '780 patent, like the '424 patent, intentionally used broader language in the claims than the preferred embodiment Nest improperly seeks to import. The '780 patent confirms this deliberate choice: "a wide variety of electronic configurations for the detector 6-i come within the spirit and scope of the present invention." *Id.* at 5:36-38.

The common denominator between the specific embodiments Nest relies on and the full scope of the claims in light of the specification is that the user can set circuitry in the device to define the location of the detector. This is what was claimed. Plaintiffs' proposal -- "hardware and/or programmable circuitry" -- is consistent with the patents' intent to claim user-settable circuitry as opposed to any specific type of user interface for the circuitry.

**B.** **"circuitry to provide for the selection of [language type presentation of said pre-recorded messages]" / "circuit to provide for the selection of [language-type presentation]"**

| Disputed Terms | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "circuitry to provide for the selection of [language type presentation of said pre-recorded messages]" ('780: 4) | hardware and/or programmable circuitry for user selection of language type | User positionable hardware switch(es), wire(s) (e.g., jumper(s)) and associated circuitry [for setting location or language, respectively] |
| "circuit to provide for the selection of [language-type presentation]" ('780: 12) | | |

The '780 patent also enables users to select a language type. Nest seeks to similarly limit this element to the preferred embodiments while Plaintiffs' proposal properly acknowledges the patentee's intent to claim the user settable circuitry rather than the setting mechanism. For the same reasons explained above in Section IV(A), the intrinsic and extrinsic evidence supports Plaintiffs' plain and ordinary meaning proposal." J.A., Exh. C at at fig. 1 element 80; Exh. A at 6:22-24, 6:67-7:2, 7:23-26.

### C.  "alarm code selector [to define a voice information code]" ('780: 27)

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "alarm code selector [to define a voice information code]" ('780: 27) | programmable circuitry [to define a voice information code] | User positionable hardware switch(es), wire(s) (e.g., jumper(s)) and associated circuitry [for setting location or language, respectively] |

Like the claim phrases above, one skilled in the art can readily understand the meaning of "alarm code selector." As there is nothing complex about this phrase, the Court should construe the phrase consistent with its plain and ordinary meaning: "programmable circuitry."

The '780 specification does not use the phrase "alarm code selector," but describes a "processor" as having the functions recited in the claim. J.A., Exh. C at fig. 1 element 30; 3:65-4:8, 4:34-35, 5:46-56. More importantly, the '780 patent does not describe even a preferred embodiment of the selector as being a "switch" or a "jumper" as Nest asserts. Thus, unlike the preceding terms where Nest is seeking to improperly import a preferred embodiment, Nest cannot even point to *any* embodiment as the source for its proposed construction.

### D.  "control electronics" / "control element" / "electronic circuit"

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "control electronics" ('310: 14)('424: 1,5)('798: 1)('040: 1) | hardware and/or programmable circuitry | Discrete hardware elements that trigger the playing of voice messages during silent periods |
| "control element" ('424: 7)('798: 19) | hardware and/or programmable circuitry | |

| "electronic circuit" ('424: 37) | programmable circuitry | |
|---|---|---|

### 1.     The Intrinsic Evidence Supports a Plain and Ordinary Meaning

Nest's proposed global construction for claim phrases "control electronics," "control element," and "electronic circuit" is overly restrictive and contradicts the claim language. The Court should adopt their plain meanings as they are easily understood by one skilled in the art.

First, the word "discrete" does not appear anywhere in the specifications. Nest provides no evidence to establish any exception to the application of plain and ordinary meaning. As a result, the Court should reject Nest's litigation induced attempt to import a "discrete hardware" limitation into the claims.

Rather, the Court should construe "control electronics" and "control element" as "hardware and/or programmable circuitry." This construction is consistent with the plain and ordinary meaning and has support in the intrinsic record. The '310 patent discloses:

> [t]he *interface and control unit 20* electronically interfaces with the environmental condition sensor and alarm unit 10 and controls the timing of a recorded voice message that is emitted simultaneously with the audible tonal pattern alarm such that the recorded voice message is emitted only during the period when the audible tonal pattern alarm cycles through a silent period.

J.A., Exh. A at 5:63–6:2 (emphasis added). The interface and control unit 20, which is one disclosed embodiment of the claim terms, also provides other functions within the detector, including encoding and decoding a coded electrical signal. *Id*. at 6:29–33; *see* 6:9–16 (explaining the interface and control unit 20's role in location selection). Instead of the claims or the specification limiting the interface and control unit 20 to a single hardware element, as Nest asserts, the patents actually disclose that interface and control unit 20 (and its electrical interfaces) as a multi-purpose hardware device including hardware and programmable circuitry. Accordingly, Nest's construction, which requires discrete elements and which imports a

"hardware only" requirement, is wrong. The relevant extrinsic evidence further confirms Plaintiffs' proposed plain and ordinary meaning, and shows the impropriety of Nest's attempted importation of limitations.[1]

Next, with regard to "electronic circuit" which Nest attempts to construe identically with "control electronics" and "control element," it is apparent that the scope of "electronic circuit" is, in fact, narrower than "control electronics/element," as it cannot be satisfied by a hardware element alone. While figure 1 of the '310 patent discloses the "control electronics" and the "control element," figures 2 and 3 illustrate the "electronic circuit." As the specification explains, "FIG. 2 is a sketch of a preferred embodiment of the electronic circuitry" while "FIG. 3 is a sketch of a second preferred embodiment." J.A., Exh. A at 6:42–43, 7:4–5. Nest's proposal fails as it attempts to import limitations from one figure into claims that address the other. One skilled in the art would appreciate that, in order to operate properly, Figures 2 and 3 require that the electronic circuit must be programmed to interact with the environmental condition sensors, the alarm unit, the signal encoder and decoder, the electronic voice memory integrated circuit, and other features of the detector. *See* J.A., Exh. A at 6:42–7:3. This conclusion supports Plaintiffs' proposed construction.

Nest's proposed construction is also inconsistent with language of other claims in the Morris Patents. Claim 14 of the '310 patent requires "control electronics coupled to the sensors *wherein the electronics emits at least two, different, unalterable pre-stored alarm indicating*

---

[1]   The New IEEE Standard Dictionary of Electrical and Electronics Terms (5th ed. 1993) ("IEEE Standard"), defines the word "control" as "those parts of a digital computer that effect the carrying out of instructions in proper sequence, the interpretation of each instruction, and the application of the proper signals to the arithmetic unit and other parts in accordance with this interpretation." Declaration of Bryan J. Sinclair ISO Plaintiff's Response Claim Construction Brief ("Sinclair Decl."), Exh. B at pp. 254-255. Likewise, the IEEE Standard defines an "element" as "[a] constituent part of the integrated circuit that contributes directly to its operation" and "electronics" as the "field of science and engineering that deals with electron devices and their utilization." Sinclair Decl., Exh. B at pp. 427, 430-431. These definitions all echo Plaintiffs' proposed plain and ordinary meaning of "hardware and/or programmable circuitry."

*tonal, output patterns.*" J.A., Exh. A at 13:17–19 (emphasis added). However, Nest's proposed construction requires that the control electronics "trigger the playing of voice messages during silent periods." Thus, adopting Nest's proposal would contradict the language of the claims that contemplate the circuitry triggering tones as well as voice messages.

Placing Nest's construction in context of claim 1 of the '040 patent also shows why it is incorrect: "[discrete hardware elements that trigger the playing of voice messages during silent periods, in response to a detected alarm condition], outputs an audio representation of a respective one of the tonal patterns and an interleaved respective verbal alarm type message in a respective silent interval." In this context, Nest's proposal is repetitive of existing language. *See generally Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").

Nest's argument that sub-components (monostable multivibrator and the electronic frequency counter) should limit these three claim phrases is also meritless. These sub-components are merely examples of hardware that could be a part of the interface and control unit 20, but do not limit the claim terms in any way. Indeed, since Nest concedes these components refer only to timing (CC Brief at 17), it is clear that the Interface and Control Unit must contain other components that perform the rest of the recited "electronically interfac[ing] with the environmental condition sensor and alarm unit 10." *See* J.A., Exh. A at 5:63-65.

Nest's reliance on *Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) ("*MIT*") is misguided.[2] In *MIT*, the Federal Circuit found that

---

[2] In a footnote, Nest argues that the disputed three phrases are possibly indefinite or subject to mean-plus-function interpretation. However, this contradicts the express holding of the Federal Circuit in *MIT*. *See MIT*, 462 F.3d at 1355–56.

the patent repeatedly limited the circuitry to a hardware embodiment. Here, neither "control electronics" nor "control element" are limited anywhere in the specification to hardware, and the references to an "electronic circuit" are likewise not limited. Nest seeks to confuse the issue by consolidating the construction of these three terms, while only focusing the meaning of "circuitry," a term of common understanding.

Contrary to Nest's argument, the Federal Circuit in *MIT* did not establish a fixed construction for "control electronics," "control element," or "electronic circuit." *See generally Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., Ltd.*, No. 2:09-cv-948, Dkt. No. 108 at 12 (E.D. Wis. Dec. 11, 2012) (construing, years after the issuance of *MIT*, "control circuit further configured" to mean "control circuit programmed or equipped with hardware or software"). Thus, the Court should adopt the plain meaning of all of these claim phrases.

> **E.** **"interconnecting a minimum of two environmental condition detectors forming an environmental condition detection system . . . interconnected detectors"**

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "interconnecting a minimum of two environmental condition detectors forming an environmental condition detection system . . . interconnected detectors" ('424: 24) | creating a wired communication path between environmental condition detectors | The detectors have a wired connection to each other for transmitting and receiving alarm signals |

### 1. The Intrinsic Evidence Supports a Plain and Ordinary Meaning

Nest's proposed construction for this claim phrase improperly limits the claim to a preferred embodiment. Once again, the Court should construe this phrase consistent with its plain meaning because it is easily understood by a skilled artisan and by a jury.

Plaintiffs' proposed plain and ordinary meaning is clearly supported by the '424 specification which explains that "[t]he present invention does not use wireless communication

between detectors; each detector may operate without any others or may operate as a hardwired system with interconnected units for those powered by 120 VAC." J.A., Exh. G at 2:13–17.

Nowhere does the '424 patent mandate that the detectors be connected directly to each other, as Nest posits. Claim 24 only requires "interconnecting a minimum of two environmental condition detectors." J.A., Exh. G at 11:66-67. Thus, the language of the claims does not support Nest's proposed construction.

Nest's proposal that "the detectors have a wired connection to each other for transmitting and receiving alarm signals" is not supported by the intrinsic record. The specification only disavows the single embodiment of wireless communication between detectors. As written, the claim clearly contemplates wired communication paths between detectors that can include one or more intervening devices.

Finally, Nest's construction imports the function of transmitting and receiving alarm signals into the claim where no such requirement exists. Instead, the claim only requires "that the interconnected detectors respond to one detector which is sensing an environmental condition." J.A., Exh. G at 12:1-3. That is, the claims address the information exchanged and Nest's proposed construction only addresses the specific physical structures present.

### F. "selector to define a coded radio frequency signal/a settable system specifying element [coupled to the control circuit] for establishing a coded system specific identifier"

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "selector to define a coded radio frequency signal" ('780: 27) | User adjustable circuitry for selecting a code for radio communications between detectors | User positionable hardware switch(es) or wire(s) (e.g., jumpers) and associated circuitry for selecting a unique code for wireless communications between detectors. |
| "a settable system specifying element [coupled to the control circuit] for establishing a coded system specific identifier" ('780: 54) | User adjustable circuitry coupled to the control circuit for establishing a unique identity of the system | |

11

Nest is correct that the primary dispute is the scope of what structures these claim terms cover. CC Brief at 14. Nest is incorrect, however, that these claim phrases are limited to require "user positionable hardware switch(es) or wire(es) (e.g., jumpers) and associated circuitry." Rather, all the claim phrases require is that some circuitry be "user settable." *See, e.g.*, J.A., Exh. C at 4:56. The claims do not specify ***how*** the user sets the circuitry (nor do they have to).

Indeed, in drafting the '780 patent, Dr. Morris was readily aware of how to describe the structures recited in Nest's proposed construction, but chose not to use those limiting terms in drafting the claims. Moreover, the '780 patent is clear that the function of the "selector" is to "program" circuitry referred to as the "receiver and decoder 170." J.A., Exh. C at 6:14-18. This further supports Plaintiffs' proposal which merely requires circuitry that is user adjustable.

As explained above, the '780 patent is  clear that its disclosure of "a jumper 300 on DIP header pins 310 or DIP switches…are alternate methods to define the installation location of a detector." J.A., Exh. C at 7:30-32. While this language discusses setting locations, the same discussion of relevant structure applies to both location setting and code setting. CC Brief at 14-15. Moreover, this excerpt shows that while Dr. Morris chose to provide several examples for users to alter the requisite circuitry, those examples were alternate methods and were not intended to be all-encompassing. This fact is further buttressed by the recitation that "[t]he various preferred embodiments described above are merely descriptive of the present invention and are in no way intended to limit the scope of the invention. Modifications of the present invention will become obvious to those skilled in the art . . . and such modifications are intended to fall within the scope of the appended claims." J.A., Exh. C at 8:40-46.

Nest's construction is an attempt to exclude software adjustability from the claims. But that technology is actually described in the '780 patent: "[w]ireless direct communication

between detectors utilizes user-selectable, coded, signal transmission. The detectors can include a user-selectable, coded wireless transmitter and receiver." J.A., Exh. C at 7:47-50. Nest's proposed construction clearly constitutes yet another improper attempt to limit the mechanism for user adjustability to avoid infringement. Moreover, since the claim terms at issue here relates the circuitry that is user adjustable, it is improper to import a limitation on *how* the user adjusts the circuitry. Accordingly, this Court should reject Nest's proposed construction.

### G. "predetermined silent intervals" / "predetermined tonal silent periods" / "silent, longer second time intervals" / "first time interval" / "periods of silence" / "periods of silence in said prescribed"

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "[tonal pattern includes] predetermined silent intervals" ('310: 14; '424: 1, 5; '798: 1; '040:1) | "[tonal pattern includes] one or more silent periods of prescribed audible tonal patterns" | The silent intervals or periods between groups of tones for a given alarm type have the same duration. The maximum silent period is 1.5 seconds for smoke and 5 seconds for carbon monoxide. |
| "predetermined tonal silent periods" ('424: 37) | "one or more silent periods of prescribed audible tonal patterns" | |
| "periods of silence in said prescribed [audible tonal pattern]" ('780:1, 12) | "one or more silent periods of prescribed audible tonal patterns" | |
| "[groups of tones are spaced apart by] silent, longer second time intervals" ('424: 9; '780: 19) | "the time interval that occurs between groups of fire alarm indicating tones that is longer than the silent time period that occurs among the members of a group" | |
| "[some of the tones/groups of tones are spaced apart by a] first time interval [and wherein others of the tones are closer together]" (424: 9; 780: 54) | "a time interval that is distinguished from a second or other time interval" | |
| "periods of silence [in the tonal pattern]" ('424: 24) | "a silent period" | |

Nest has proposed that the six different phrases above be construed as a single, identical phrase. In so doing, Nest argues that each disputed claim phrase should be narrowed to require a

13

maximum period. Nest's proposed global construction is incorrect, and the limitation it seeks to import is baseless.

### 1. The Intrinsic and Extrinsic Evidence Support a Plain and Ordinary Meaning

With respect to the first three claim phrases in the table, Plaintiffs' proposed recitations of the plain and ordinary meaning have support in the respective claims, specifications, and drawings of the '310, '424, and '780 patents. *See*, *e.g.*, J.A., Exh. A at 3:2-10 ("[NFPA]…require[s]…a silence period between tonal patterns…"), 4:57-61 ("…fit within…[UL's]…silence period of standard smoke detector and carbon monoxide detector tonal pattern alarms"), 7:35-38 ("The recorded voice message 90 is inserted into the defined silence periods of the prescribed audible tonal pattern alarm 85 consistent with the conventional smoke detector alarms"), figs. 4-6; J.A., Exh. G at 3:4-12, 4:59-63 (same); J.A., Exh. C at 4:24-27 ("in addition to sounding a local tonal alarm with an intervening verbal alarm identifying message, the active detector communicates wirelessly with other detectors"), 6:48-51 ("The recorded voice message 220 is inserted into the defined silence periods of the prescribed audible tonal pattern alarm 210 consistent with conventional smoke detector alarms"), 6:60-61 ("[o]ther tone patterns and silent intervals come within the spirit and scope of the present invention"), figs. 3-7.[3] Without question, the specifications are replete with intrinsic support for Plaintiffs' plain and ordinary meaning proposals for the first three phrases.

With respect to the phrase "silent, longer second time intervals," Plaintiffs' proposed construction also has substantial support in the intrinsic record. J.A., Exh. G at 3:4-12 ("National Fire Protection Association…require[s]…a silence period between tonal patterns…"), 4:59-63

---

[3] Moreover, the extrinsic evidence also supports Plaintiffs' proposal as the term "silent" is defined as "making no sound or noise, quiet." *See* Sinclair Decl., Exh. A, The American Heritage Dictionary ("American Heritage"), Second College Edition, copyright 1982, 1985 at p. 1139.

("fit within…Underwriters Laboratories…silence period of standard smoke detector and carbon monoxide detector tonal pattern alarms"), 7:37-40 ("The recorded voice message 90 is inserted into the defined silence periods of the prescribed audible tonal pattern alarm 85 consistent with the conventional smoke detector alarms"), figs. 4-6. There is simply nothing in the specifications that justifies the importation of identical durations or maximum silent periods, as Nest argues.

Finally, Plaintiffs' recitation regarding the fifth phrase ("first time interval") also has support in the claims, specification, and drawings of the '424 patent. J.A., Exh. G at 3:4-12, 7:37-40 (*quoted supra*), figs. 4-6. Again, Plaintiffs' proposal is correct.

## 2. Nest's Proposal Violates the Doctrine of Claim Differentiation

One of the most glaring problems with Nest's omnibus proposal is that it violates the doctrine of claim differentiation, in which "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim*, 358 F.3d at 910. This doctrine is premised in the notion that construction of claim terms should not render other limitations meaningless. *Becton, Dickinson and Co. v. Tyco Healthcare Grp. LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010).

Here, independent claim 14 of '310 patent recites ". . . unalterable pre-stored alarm indicating tonal, output patterns wherein each pattern includes ***predetermined silent intervals*** . . . ." J.A., Exh. A at 13:14-34. Claim 19, which depends from claim 14, provides further specificity by reciting "… wherein each tonal output pattern defines groups of substantially identical output tones ***with constant intragroup spacing of a first amount and constant intergroup spacing of a second amount wherein the second amount is at least two times than the first amount***." *Id*. at 14:7-11. Claim 20, which further depends from claim 19, recites "…wherein one tonal pattern has an intragroup spacing ***on the order of 0.5 seconds and an***

*intergroup spacing on the order of 1.5 seconds*." J.A., Exh. A at 14:12-14. Adopting Nest's proposal would incorrectly render claim 20 superfluous.

The prosecution history further refutes Nest's construction. During prosecution of the '310 patent, the applicant stated "[t]he tonal alarms are audibly distinct from one another and each group contains groups of spaced apart tones which are in turn spaced apart from one another by longer silent intervals." J.A., Exh. B at BRK_000109-110. In other words, in describing the invention during prosecution, the Applicant was clear that the specifics required by Nest's proposed construction were not required. Nest's attempt to limit the claims by certain regulations that were expressly distinguished during prosecution is improper.[4]

> **H.** **"Outputs…an interleaved…in a respective silent interval/ "emits…in respective silent intervals"/"injects…into only the second time intervals"/ "emits…during the periods of silence"/ "… is emitted during periods of silence"**

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "outputs…an interleaved…[message] in a respective silent interval" ('310: 14; '040: 1) | outputs an audio representation of a respective one of the tonal patterns with an interleaved respective verbal alarm type message in a respective silent interval | The same verbal message (of alarm type and/or location) is announced during each intergroup silent period. |
| "emits…[message(s)] in respective silent intervals" ('424: 1, 5; '798: 10) | emits the audible tonal pattern and respectively emits the verbal alarm-type message in respective silent intervals | |
| "[message] emitted in respective silent intervals" ('798: 1) | the selected location message to be repetitively emitted in respective silent intervals | |
| "injects…[fire indicating word] into only the second time intervals [between groups of tones]" ('424: 7; '798: 19) | injects the stored fire indicating word into only the second time intervals between groups of fire alarm indicating tones | |
| "emits . . . [voice message] . . . during the | emits during a silent period | |

---

[4] For the same reasons, the intrinsic evidence also supports Plaintiffs' proposed plain and ordinary meaning of the following claim phrases: "silent, longer second time intervals"; "first time interval"; "periods of silence"; and "periods of silence in said prescribed."

| | | |
|---|---|---|
| periods of silence" (424: 24) | | |
| "[voice message] is emitted during periods of silence" ('780: 1) | emitted during a silent period | |

### 1. The Intrinsic Evidence Supports Adoption of Plain and Ordinary Meanings

The intrinsic record supports each of Plaintiffs' proposals, which reflect a plain and ordinary meaning of the terms. *See*, *e.g.,* J.A., Exh. A at 3:2-10, 4:57-60 and 7:35-38 (*quoted supra.,* at p. 14); and figs. 4-6[5]; J.A., Exh. G at 1:44-52 ("In conventional … detectors, there are silent periods within the prescribed audible tonal pattern alarms where recorded verbal messages such as "smoke" or "CO" or "carbon monoxide" or "smoke in basement" or "utility room" (as examples) may be played during this alarm silence period…"); *see also, id.* at 5:65-6:4; and figs. 4-6[6]. Accordingly, there is nothing that supports Nest's limiting proposal that requires the recitation of the same message during each silent period.

With regard to the fourth disputed term Nest proposes for construction, the Court should also adopt the plain and ordinary meaning of this phrase per Plaintiffs' proposal. Not surprisingly, the figures in the '424 and '798 specification depict the precise spaces into which the fire indicated words are injected. *See* J.A., Exhs. C & I at figs. 4-6 (the second interval can contain a fire indicating word).

With respect to the fifth and sixth disputed claim phrases in the table above, Plaintiffs' proposals are again supported by the relevant intrinsic records. *See*, J.A., Exh. G at 3:4-12; 4:59-

---

[5] The extrinsic evidence also supports the plain and ordinary meaning as the word "interleaved" means "to arrange in or as if in alternate layers." Sinclair Decl., Exh. C, Merriam Webster's Collegiate Dictionary, 10th ed., copyright 1996 ("Merriam-Webster's")) at p. 610.

[6] The extrinsic evidence is in accord as the word "interval" means "a space of time between events or states." Sinclair, Exh. C (Merriam-Webster's) at p. 613.

63; and 7:37-40 (*quoted supra.,* at pp. 14-15), and figs. 4-6; *see also* J.A., Exh. C at 4:24-27; 5:6-11; 6:48-51 and lines 60-61 (*quoted supra.,* at pp. 5, 14); and 7:16-19 and lines 23-26 ("The recorded voice message 280 is inserted into the defined silence periods of the prescribed audible tonal pattern alarm 270 consistent with conventional carbon monoxide alarms" and "The exemplary tonal pattern alarms and recorded voice messages are illustrative and not intended to exhaustively illustrate all possible tonal alarm patterns and recorded voice messages."); 8:7-12 ("Verbal information regarding the location of the sensed environmental condition, the type of the sensed environmental condition, or both, is emitted during silent periods within the audible tonal pattern alarm emitted by the active detector during an alarm condition"); and Figures 3-7. Accordingly, as there is simply nothing requiring an identical message to be recited during the silent periods, the Court should adopt Plaintiffs' proposed plain and ordinary meanings.

## 2. Nest's Attempt to Globally Import Limitations is Incorrect

Nest's proposal asks the Court to completely disregard the material distinctions between the claims and adopt a wholesale "blanket" construction for claim limitations that contain different concepts and employ different words in doing so. This proposal cannot be correct, as it renders the different limitations in the claim terms meaningless. *Becton, Dickinson and Co.*, 616 F.3d at 1257.

By way of illustration of the problem with Nest's "global" construction, claim 14 of the '310 patent recites a detector "…wherein the voice circuitry includes *at least two pre-stored, user unalterable, verbal alarm output messages*…." J.A., Exh. A at 13:23-25. This claim term eliminates the possibility that the "same verbal message (of alarm type and/or location)" must be announced during a silent period. In short, there can clearly be "at least two" different verbal messages stored.

In a similar vein, claim 14 of the '310 patent also discloses that there is "an interleaved respective verbal alarm type message in a respective silent interval." Nest's proposed construction of the claim term "outputs . . . an interleaved . . . in a respective silent interval" to mean "the same verbal message is announced during each intergroup silent period" is incorrect as it requires that the Court completely disregard other clear words present in the claim -- "*at least two* verbal alarm output messages" and "an interleaved *respective verbal alarm type message in a respective silent interval.*"

### I. "A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm"

| Disputed Term | Plaintiffs' Proposal | Nest's Proposal |
|---|---|---|
| "A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm" | "a processor programmed with a set of instructions that receives input data and compares the input data to pre-selected threshold data values in memory for selecting tonal patterns indicative of a sensed condition and presents the selected tonal patterns to an audible alarm" | **Function**: "retrieving a selected tonal alarm pattern and presenting same to the audible alarm"<br><br>**Structure**: The '780 patent fails to disclose supporting structure for a programmed processor, such as the steps or operations the processor performs to accomplish the recited function; thus, this claim is invalid as indefinite |

### 1. This Claim Phrase is Not a Means-Plus-Function Limitation

This claim phrase does not use the word "means." As the Federal Circuit has held, "[w]hen the claim drafter has not signaled his intent to invoke § 112, ¶ 6 by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012). Indeed, the Federal Circuit has "seldom" held that a phrase without the word "means" is a means-plus-function limitation. *Lighting World, Inc. v. Birchwood*, 382 F.3d 1354, 1358, 1362 (Fed. Cir. 2004). Here, the claim recites

sufficient structure (a "processor"). Because Nest has failed to demonstrate that the claim limitation is "devoid" of structure, the Court can reject its proposed construction for this reason alone. *TriMed, Inc.* v. *Stryker Corp.,* 514 F.3d 1256, 1259–60 (Fed. Cir. 2008) ("[s]ufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure").

The remainder of Nest's argument is premised on its ability to overcome the presumption that this term is not governed by § 112, ¶ 6, and can be easily dispensed with. Briefly, Nest proposes that the limitation has a function of "retrieving a selected tonal alarm pattern and presenting same to the audible alarm" but that the "'780 patent fails to disclose supporting structure for a programmed processor, such as the steps or operations the processor performs to accomplish the recited function." This is untrue. Indeed, this claim limitation was not amended during prosecution, meaning that the precise function clearly recited in the claim was part of the original filing. J.A., Exh. D at BRK_000245, BRK_000247. Since the "steps or operations the processor performs" are recited in the claim, Nest's argument (which amounts to an invalidity argument founded on 35 U.S.C. § 112, ¶ 6) lacks merit. The Court should decline Nest's invitation to find that it has overcome the presumption that this term is not governed by § 112, ¶ 6. It has not.

### J. "substantially symmetrical in-flow and out-flow of ambient atmosphere" / "facilitates a symmetrical inflow of ambient atmosphere into the sensor"

| Disputed Term | BRK's Proposal | Nest's Proposal |
| --- | --- | --- |
| "substantially symmetrical in-flow and out-flow of ambient atmosphere" ('182: 1, 30) | "[housing provides] in flow and out-flow of ambient atmosphere to and from the sensor in a substantially corresponding form" | The air flow paths are [substantially] the same from opposing sides and are not obstructed or redirected by other components, vanes or deflectors. |
| "facilitates a symmetrical inflow of | "[housing] facilitates inflow of ambient atmosphere into the sensor in a | |

| ambient atmosphere into the sensor" ('182: 10) | corresponding form" | |
| --- | --- | --- |

These claim terms are readily understandable to lay jurors, and as such there is no need to provide a specific construction. *GE Lighting Solutions, LLC v. Agilight, Inc.*, No. 2013-1267, slip op. at 5 (Ct. App. May 1, 2014). The concepts of in-flow and out-flow are easily understandable to anybody who has felt air blown by a fan, and the notion of symmetry is not difficult for jurors to grasp. There is no need to introduce the notion of "opposing sides," and there is certainly no need to introduce industry jargon such as "vanes or deflectors," as Nest seeks to do.

In any event, Nest's proposed construction is flawed for two reasons: First, it seeks to read several limitations into the claim without legitimate basis. Second, it fundamentally fails to recognize that the symmetry of the '182 patent is with respect to the <u>housing</u>, not the <u>sensor</u>. Thus, BRK's proposal accurately sets forth the plain and ordinary meaning of the terms.

### 1. The Intrinsic and Extrinsic Evidence Supports a Plain and Ordinary Meaning

BRK's proposed plain and ordinary meaning, which clarifies that the requisite symmetry is with respect to the housing, reflects the '182 patent's description that "ambient atmosphere…is able to flow unimpeded into and out of the sensor 40 *in a symmetrical fashion relative to the housing*." J.A., Exh. E at 3:11-14 (emphasis added). BRK's proposal is also consistent with the '182 patent's description of Fig. 3B, in which "ingress and egress of airborne ambient can occur symmetrically relative to housing 62." *Id.* at 3:60-62.

With regard to the word "symmetrical," to the extent the Court finds that the notion of symmetry relative to the housing is difficult for jurors to understand, BRK has provided a clarification of that term: "in a corresponding form." This plain and ordinary meaning is also

consistent with the standard definition of "symmetry" which is defined as "[a] relationship of characteristic correspondence, equivalence, or identity among constituents of a system or between different systems," and "[c]orrespondence of form and arrangement of parts on opposite sides of a boundary, such as a plane or line or around a point or axis."  Sinclair Decl., Exh. A (American Heritage) at p. 1231.

### 2. Nest's Proposal Is Unduly Narrow and Its Negative Limitation is Improper

Nest actually concedes that its construction imports a negative limitation into the claims from the '182 specification.  CC Brief at 22.  Although Nest argues this result is mandated, its arguments are meritless.  The symmetry addressed by claims relates to ambient flow *into the housing*.  The negative limitation Nest proposes deals with components *inside the housing*, after the atmosphere has already entered the housing.  In the two passages of the '182 patent Nest cites in support of its "importation" argument, the patent is discussing the flow of atmosphere within the housing, and is not addressing the entry pattern of atmosphere *into the housing*.  J.A., Exh. E at 2:5-9 ("venting geometries and baffling designs"), 3:11-19 (referring to flow of atmosphere "into openings 40a, 40b of sensor 40).  These passages do not compel Nest's negative limitation request because they refer to locating the sensor directly in the flow path -- not to the pattern of atmosphere flow *into the housing*.  *Id.*

Finally, Nest relies on a passage which states that its design eliminates the need for "*complicated* venting geometries and *complex* baffling designs."  J.A., Exh. E at 2:6-7.  This passage clearly shows that the '182 patent did not contemplate the wholesale excision of venting geometries or baffling designs, but rather those that were complicated.

Nest's cited passages hardly constitute an "intentional disclaimer, or disavowal, of claim scope," *Phillips*, 415 F.3d at 1316, and certainly do not constitute a "clear and unmistakable"

statement to limit the claims in the way Nest proposes. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

### K. "for atmospheric ingress and egress with a substantially planar flow path [through the housing adjacent to the interior surface]"

| Disputed Term | BRK's Proposal | Nest's Proposal |
|---|---|---|
| "for atmospheric ingress and egress with a substantially planar flow path [through the housing adjacent to the interior surface]" ('182: 20) | "such that the atmosphere enters and exists the interior surface of the housing substantially parallel to the interior surface of the housing [and adjacent to the interior surface]" | The entrance and exit flow paths lie largely in two dimensions and are not vertically deflected or displaced by other components, vanes or deflectors. |

As with the "symmetrical" terms discussed above, this claim phrase is also readily understandable by one skilled in the art. Nest's proposal for this term not only imports limitations from an alleged (but non-existent) disclaimer, but further muddies the waters with the addition of the litigation-motivated phrase "lies largely in two dimensions."

### 1. BRK's Proposal is Consistent With the Plain and Ordinary Meaning

BRK simplifies "atmospheric ingress and egress" to the phrase "atmosphere enters and exits," a phrase that uses words that one skilled in the art (and jurors) would recognize. Nest does not seem to dispute this as it uses the nearly identical phrase "entrance and exit flow paths."

BRK also proposes a plain, readily understandable phrase to describe the remainder of the claim term by proposing that "substantially planar flow path" means "substantially parallel to the housing." Again, this readily understandable language: (a) gives a frame of reference for the word "substantially"; and (b) more clearly explains the already understandable word "planar" as being "parallel to the housing." Thus, BRK's proposal is consistent with the plain meaning.

23

2.      **Nest's Proposal Is Unduly Narrow and Its Negative Limitation is Improper**

As discussed above, Nest's proposed negative limitation ("and not vertically deflected or displaced by other components, vanes, or detectors") is improper as the '182 patent did not "clear[ly] and unmistakabl[y]" limit the claims in any way, much less in the way Nest proposes. *See Thorner*, 669 F.3d at 1366-67.  In addition, Nest's proposed disclaimer cannot pertain to both symmetry of atmospheric inflow around the housing (as explained above) and also to the planar nature of the flow of atmosphere.  Thus, it is inappropriate to import the negative limitation Nest proposes.

Nest's proposal also seeks to replace the readily understandable phrase "substantially planar" with the much more amorphous jargon "lie largely in two dimensions."  Nest's construction is inconsistent with the claim language and is internally inconsistent.  Nest's assertion that the flow paths "are not vertically deflected" reads the word "substantially" (as a modifier to the phrase "planar flow path") completely out of claim 20.  Nest's proposal therefore does not "stay[] true to the claim language."  CC Brief at 23 (citing *Phillips*, 415 F.3d at 1316).

Nest's proposed absolute prohibition on vertical deflection is also inconsistent with Nest's own proposal, which provides for atmosphere entering and exiting the housing along paths that "lie <u>largely</u> in two dimensions."  Indeed, Nest's own briefing belies the strict prohibition on vertical deflection by admitting "the smoke flow (F1 and F2 in Fig. 2C []) through the housing of the alleged invention is not directed away from the ceiling and has <u>no significant vertical component</u>..."  CC Brief at 23 (emphasis added).  Thus, Nest concedes that there is at least some "vertical component."

And while Nest cites to uses of the word "planar" in the specification of the '182 patent, it fails to grasp that the claims use the term "substantially planar."  CC Brief at 23-24.  Nest's

citation to the prosecution history of the '182 patent actually supports BRK's proposal.  In the prosecution history, the planar reference for the "substantially planar flow path" is the second surface, which is a component of the housing.  CC Brief at 24.  This usage supports Plaintiffs' proposal, which requires flow parallel to the housing, and does not support Nest's construction, which references "two dimensions" without providing a baseline for what defines those two dimensions.[7]   Nest's complaint regarding BRK's use of the word "parallel" is disingenuous as well, since fluid flow parallel to a plane (*i.e.* the housing) is planar.[8]   Nest also complains that BRK's proposal does not reflect the claim language "through the housing," yet BRK's proposal addresses this requirement in nearly the same way Nest's proposal does (BRK proposes "atmosphere enters and exits the housing…" while Nest proposes "entrance and exit flow paths…").

Particularly in view of BRK's proposed revision, in the event the Court concludes that the claim language is not plainly understandable by one of skill in the art (and, in turn, by jurors), BRK's proposal of "such that atmosphere enters and exits the housing substantially parallel to the interior surface [and adjacent to the interior surface]" is correct.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court either decline to construe the disputed claim terms and phrases or, alternative, adopt Plaintiffs' proposed plain and ordinary meanings of the disputed claim phrases.

---

[7] Under Nest's construction, mounting a detector on a sloped cathedral ceiling as opposed to a horizontal ceiling would affect whether the limitation was satisfied.  This cannot be correct.

[8] To the extent "substantially parallel to the housing" is confusing to Nest, BRK has no objection to revising this portion of its construction to read "substantially parallel to the interior surface."

Date: May 12, 2014

Respectfully submitted,

_/s/ Bryan J. Sinclair_

Bryan J. Sinclair (_pro hac vice_)
bryan.sinclair@klgates.com
K&L GATES LLP
630 Hansen Way
Palo Alto, CA 94304
Tel: (650) 798-6700
Fax: (650) 798-6701

Sanjay K. Murthy
sanjay.murthy@klgates.com
Benjamin E. Weed
benjamin.weed@klgates.com
Devon C. Beane
devon.beane@klgates.com
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Tel: (312) 372-1121
Fax: (312) 827-800

Ravi S. Deol
ravi.deol@klgates.com
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5500
Fax: (214) 939-5849

**ATTORNEYS FOR PLAINTIFF BRK
BRANDS, INC.**
Lynn J. Alstadt (_pro hac vice_)
lynn.alstadt@bipc.com
Craig G. Cochenour (_pro hac vice_)
craig.cochenour@bipc.com
BUCHANAN INGERSOLL & ROONEY P.C.
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, Pennsylvania 15219-1410
Tel: (412) 562-8800
Fax: (412) 562-1041

**ATTORNEYS FOR PLAINTIFF GARY J.
MORRIS, PH.D.**

26

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 12th day of May, 2014, the foregoing document was served on all counsel of record who have consented to electronic service via the Court's CM/ECF system.


/s/ *Bryan J. Sinclair*
Bryan J. Sinclair