**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BRK BRANDS, INC., and
GARY J. MORRIS, PH.D.,

                          Plaintiffs,

        v.

NEST LABS, INC.,

                          Defendant.

Civil Action No.: 13-cv-7900

Honorable Richard A. Posner

**<u>DEFENDANT NEST'S REPLY CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.    Preliminary Statement ................................................................................................1

II.   The Morris Patents ('310, '424, '798, '040 and '780 Patents)...........................................1

    A.    "Predetermined [tonal] silent [intervals/periods]" / "time intervals [between groups of tones]" / "periods of silence [in the tonal pattern]" ...............1

    B.    Emitting voice messages in "respective silent intervals" / "periods of silence" ................................................................................................3

    C.    Location and Language Selection Members, Elements and Circuits .....................4

    D.    Selector/Settable Element to Select Radio Frequency ............................................7

    E.    "Control electronics" / "control element" / "electronic circuit"............................8

    F.    Wired "interconnecting"...................................................................................11

    G.    "A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm"........................................................12

III.  The Devine Patent ('182 Patent) ...................................................................................13

    A.    "[Substantially] symmetrical in-flow and out-flow"............................................13

    B.    "substantially planar flow path through the housing" ...........................................15

**TABLE OF AUTHORITIES**

**CASES**

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007) ................................2, 4

*Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014)...................................12

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) ..............13

*Autogiro Co. of America v. United States*, 384 F.2d 391 (Ct. Cl. 1967)............................................3

*Blackboard v. Desire2Learn*, 574 F.3d 1371 (Fed. Cir. 2009) .......................................................13

*Brandeis Univ. v. Keebler Co.*, 2013 U.S. Dist. LEXIS 18948 (N.D. Ill. Jan. 18, 2013) .................1

*Curtiss-Wright Flow Corp. v. Veland, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006)...........................3, 4, 10

*Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998) .....................................5, 8

*Electro Med. Sys. S.A. v. Cooper Life Scis.*, 34 F.3d 1048 (Fed. Cir. 1994) ....................................7

*Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367 (Fed. Cir. 2012)...................................12

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357 (Fed. Cir. 2010) ......................10, 11

*Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558 (Fed. Cir. 1990)......................4

*In re Katz Interactive Call Processing Patent*, 639 F.3d 1303 (Fed. Cir. 2011)..............................12

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) .............................................7

*Lighting World v. Birchwood*, 382 F.3d 1354 (Fed. Cir. 2004) ......................................................12

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).........................................................1

*Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) ......................................10

*Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.*, 2012 U.S. Dist. LEXIS 188112 (E.D. Wis. Dec. 11, 2012) ...................................................................................................................10, 11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)...............5, 13

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .........................................passim

*Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243 (Fed. Cir. 1998)...........................15

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ................................14

*TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256 (Fed. Cir. 2008) ........................................................12

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)...............................................8

*Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999).................................4, 7

**TABLE OF ABBREVIATIONS**

| Exh. No. | Document Description | Abbreviation |
|---|---|---|
| **Joint[1] - A** | U.S. Patent No. 6,144,310 (BRK_000001 – BRK_000015) | '310, [Col.]:[ll-ll] |
| **Joint - B** | File History of U.S. Patent No. 6,144,310 (BRK_000016 – BRK_000191) | BRK_[xxxx-xxxx] |
| **Joint - C** | U.S. Patent No. 6,323,780 (BRK_000192 – BRK_000207) | '780, [Col.]:[ll-ll] |
| **Joint - E** | U.S. Patent No. 6,377,182 (BRK_000377 – BRK_000383) | '182, [Col.]:[ll-ll] |
| **Joint - G** | U.S. Patent No. 6,600,424 (BRK_000447 – BRK_000460) | '424, [Col.]:[ll-ll] |
| **Joint - I** | U.S. Patent No. 6,784,798 (BRK_000686 – BRK_000698) | '798, [Col.]:[ll-ll] |

---

[1] Refers to the parties' Joint Appendix (D.I. 143), pursuant to Local Patent Rule 4.2, and its Exhibits.

## I.        PRELIMINARY STATEMENT

Plaintiffs' approach to claim construction, which tries to capture subject matter they did not invent, has been soundly rejected by the Supreme Court, the Federal Circuit and this Court. First, Plaintiffs would improperly cede claim construction to the jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996). Second, Plaintiffs repeatedly relegate the specification and intrinsic record to a secondary role and direct this Court to pre-*Phillips* cases that do the same (e.g., *Liebel-Flarsheim*, *Anchor Wall*). To avoid systematic over-breadth, claim construction should begin with the claims, the specification and the prosecution history; the review of this intrinsic record is not limited to searching for express definitions or clear disavowal. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320-21 (Fed. Cir. 2005) (en banc); *Brandeis Univ. v. Keebler Co.*, 2013 U.S. Dist. LEXIS 18948, at *8 (N.D. Ill. Jan. 18, 2013) (citing *Phillips*, 415 F.3d at 1315). By omitting portions of the patents, Plaintiffs propose overbroad "plain meaning" constructions that conflict with the claim language and the disclosures.

## II.       THE MORRIS PATENTS ('310, '424, '798, '040 AND '780 PATENTS)

### A.        "Predetermined [tonal] silent [intervals/periods]" / "time intervals [between groups of tones]" / "periods of silence [in the tonal pattern]"

Plaintiffs' argument that the intrinsic record is replete with support for their constructions and not Nest's constructions of these common terms (D.I. 145 at 14-15) is an illusion Plaintiffs create by systematically and repeatedly removing the phrases "maximum," "1.5 seconds" and "present invention" from the portions of the patent Plaintiffs cite (example below). D.I. 145 at 14 (annotations and highlight added). Plaintiffs repeat this approach for each claim phrase as if by some magic they can erase the words the patentee used to describe its "invention."[2] *See, e.g.,* D.I. 145 at 14-15 (citing '424, 3:4-12 and 4:59-63 (removing the same language)).

---

[2] Plaintiffs' repeated citation to the same or conceptually identical passages in the patents belies their arguments that these terms should be treated separately for purposes of construction.

> **1. The Intrinsic and Extrinsic Evidence Support a Plain and Ordinary Meaning**
>
> With respect to the first three claim phrases in the table, Plaintiffs' proposed recitations of the plain and ordinary meaning have support in the respective claims, specifications, and drawings of the '310, '424, and '780 patents. *See, e.g.*, J.A., Exh. A at 3:2-10 ("[NFPA]…require[s]…a silence period between tonal patterns…"), 4:57-61 ("…fit within…[UL's]…silence period of standard smoke detector and carbon monoxide detector tonal pattern alarms"), 7:35-38 ("The recorded voice message 90 is inserted into the defined silence periods of the prescribed audible tonal pattern alarm 85 consistent with the conventional smoke detector alarms"), figs. 4-6; J.A., Exh. G at 3:4-12, 4:59-63 (same); J.A., Exh. C at 4:24-27 ("in

Plaintiffs cannot now rewrite the patents, and the claims must be interpreted in light of the intrinsic record to preserve the public notice function. *See, e.g.*, *Phillips*, 415 F.3d at 1315-17 (citations omitted). Plaintiffs' reference to the prosecution (D.I. 145 at 16) ignores the many statements the patentee made disclaiming the use of variable tonal patterns for a given alarm type and emphasis on the maximum silence period of 1.5 seconds for smoke detectors, including those in the same response. *See, e.g.*, D.I. 141 at 7 (citing BRK_000110-111 and 115). The ***unaltered*** intrinsic record shows that Nest's construction of these commonly supported terms is proper because the patentee repeatedly told the public that, for a given alarm type, its "invention" involved the use of non-variable tonal patterns with particular maximum intergroup silent periods according to the then existing NFPA and UL guidelines. *See* D.I. 141 at 5-7.

Plaintiffs' claim differentiation arguments are similarly unavailing. Claim differentiation is a guide, not a rigid rule, and any presumption associated therewith may be overcome where the patent's description and/or prosecution history describe the "invention" as having certain features. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367-71 (Fed. Cir. 2007) (affirming district court's limiting "composite compositions" to "pellet" and "linear extrudate forms" based on repeated description of the "invention" despite the existence of other claims

directed to pellets and extrudates); *Curtiss-Wright Flow Corp. v. Veland, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006) (reversing district court construction that relied on claim differentiation because it may not be used to broaden claims beyond their correct scope as informed by the patent's description of what the invention is) (citations omitted); *Autogiro Co. of America v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967). In the present case, where the patentee emphasized the non-variable tonal patterns with maximum silent periods for a given alarm type, Nest's construction would be proper even if it rendered claim 20 superfluous as Plaintiffs contend. D.I. 145 at 15-16. Further, Plaintiffs' argument also fails because Nest's construction does not render claim 20 superfluous. Claim 20 (which depends on claim 19) includes at least the following additional requirements that are not part of Nest's construction: (a) the tones are substantially identical, (b) the intergroup spacing is at least two times the spacing between tones, and (c) the spacing between tones is 0.5 seconds. *Autogiro*, 384 F.2d at 404-05 (differences should "not [] be undervalued because of their slightness since claims covering the same invention in varying degrees of breadth or scope usually only have slight differences."). Moreover, claim 20 describes the tonal pattern for a single alarm condition (smoke), whereas Nest's construction accounts for multiple conditions (e.g., smoke and CO).

### B. Emitting voice messages in "respective silent intervals" / "periods of silence"

Although Plaintiffs' response lists a multitude of examples (D.I. 145 at 17-18)[3], not one of the examples even hints at anything other than playing the same verbal message in each intergroup silent interval as in Nest's proposed construction. *See* D.I. 141 at 8-10. Plaintiffs' reliance on passages that describe the use of different alarms or different messages for different

---

[3] Plaintiffs' definition of the word "interleaved" actually supports Nest's proposed construction because it refers to alternating layers, meaning the message "alternates" with the groups of tones as there are only two audible components disclosed in the patent (i.e., "layers"). D.I. 145 at 17, n. 5.

alarm conditions or detector locations is misplaced. D.I. 145 at 17-18. These passages, which indicate, for example, that the message might be "Smoke on Second Floor" or "Second Floor" ('780, 5:6-11 (D.I. 145 at 17-18)), merely reflect that although the played message is always the same, it need not be a particular word or words. The passages do not address the question at hand nor do they rebut that the patents only describe and enable the playing of the same message in each intergroup silent period for a given alarm condition. D.I. 141 at 10-11; *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (scope of claims limited to "[t]he only system [ ] described and enabled").[4] Plaintiffs provide no response on this point.

Plaintiffs' argument that Nest's construction renders words of the claims meaningless is similarly unfounded. D.I. 145 at 18-19. Claim 14, which Plaintiffs cite, includes two different sensors ('310, 13:16), so of course it has two different verbal messages (presumably one for each sensed condition). Nothing in claim 14 or anywhere else in the patent suggests that this means anything other than the same message is played during each intergroup silent period *for a given alarm condition*. Finally, to the extent Plaintiffs complain that Nest's proposal should not be applied to all these terms, Plaintiffs' citation to the same (or conceptually identical) passages across the patents as support confirms that the patentee has claimed the same invention using different words. *Andersen*, 474 F.3d at 1370; *Curtiss-Wright*, 438 F.3d at 1380-81; *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990).

### C. Location and Language Selection Members, Elements and Circuits[5]

Plaintiffs' "plain meaning" approach should be rejected. There is no basis to assume that

---

[4] On pages 9 and 11 of Nest's opening brief the citations to the *Wang* case should be 1382-83, not 1392.

[5] Despite the Court's agreement that these terms are properly grouped together, (D.I. 135 at 2), Plaintiffs responded to this dispute in three separate sections of their responsive brief, Sections IV.A-C. D.I. 145 at 3-6.

a jury would understand these technical terms in a manner consistent with the intrinsic record as shown below. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008). The flaw in Plaintiffs' "plain meaning" position is further demonstrated by their own misunderstanding of the "alarm code selector [to define a voice information code]" in '780, claim 27, which refers to user selection of a location for a voice message. *See* '780, 4:59-64. In support of their argument, Plaintiffs cite unrelated passages that: refer to a processor selecting tonal alarms—not a voice message ('780, 3:65-4:8); do not refer to user selection of location ('780, 4:34-35); and refer to some unspecified "alarm decision" ('780, 5:46-56). D.I. 145 at 6. Simply put, the "processor" to which Plaintiffs refer plays no role in user-selection of a location, which is the issue for the terms in question. Rather, the location selector, which is unrelated to the processor, is already defined as a "user-set dip-switch/ jumper." '780, 4:59-64.

Plaintiffs' "programmable circuitry" proposal risks causing the jury to misunderstand this to encompass software on a processor, which is disclosed nowhere in the patents. The only portion of the patents Plaintiffs cite that uses the word "program" states that the user-set "location code selector 50 *programs the transmitter*," not that the selectors are programmable circuitry. D.I. 145 at 5 (citing '780, 4:64-65) (emphasis added). Plaintiffs' reliance on a single generic statement that alternative detector electronics could be used is not persuasive, as it is not directed to the location or language selector on a detector and conflicts with the clear disclosure of the specification. D.I. 145 at 5 (citing '780, 5:36-38); s*ee Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998) (Court disregarded a single sentence that conflicted with the rest of the specification). Moreover, as explained below, the patents have specifically defined what the location code selector *is*.

Plaintiffs' argument that Nest seeks to read in limitations purely from the preferred

embodiments relies on selectively ignoring portions of the patent they quote.  For example, Plaintiffs cite '424, 6:16-18 (D.I. 145 at 4) but ignore the immediately preceding words: "for [ ] embodiments of the *invention* requiring identification of location . . . selectable coding apparatus 50 (jumper selector or DIP switch) . . . *is* provided to select." '424, 6:11-18 (emphasis added). These switches or wires are not mere embodiments and the patent does not list the jumpers or DIP switches as mere examples—they are in all embodiments that require location selection as recited by '424 claims 9 (10:14-16) and 24 (11:56-57) and '780 claim 1 (9:8-9).  Similarly, when citing to the '780 patent's description of selecting a location (applicable to '780 claim 27, where the selector "define[s] a voice information code" (11:28-29)), Plaintiffs selectively remove the beginning of the quote "*the location code selector 50 is* a user-set dip-switch / jumper arrangement that enables the user to define the *location voice information* that remote units will play upon receiving a signal from an alarmed detector."  D.I. 145 at 4-5 (citing '780, 4:59-61) (emphasis added).  Finally, although Plaintiffs separate their argument concerning the terms in '780, claims 4 (9:32-34) and 12 (10:17-19) that refer to the selection of language (D.I. 145 at 6 (citing '310 patent)), Plaintiffs do not offer any different argument, nor could they as the only place the '780 patent refers to language selection (other than in the claims) is where it incorporates the '310 patent by reference ('780, 3:39-41).  Once again, however, the very passages Plaintiffs cite define the language code selector as a jumper set or DIP switch.  *See, e.g.*, '310 6:22-23 ("*language code selector (jumper set or DIP switch) 60 is* used to choose the language") (emphasis added); 6:67-7:2 (referring to element 60); 7:23-25 (same).

As explained in Nest's opening brief, these definitional descriptions come not just from embodiments, but from all parts of the patents and properly inform the construction of these terms.  *See* D.I. 141 at 12-14 (citing relevant passages of patents).  Plaintiffs do not dispute this

but instead ask the Court to disregard the clear context provided by the patents when determining the meaning of these terms, relying on *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004), and *Electro Med. Sys. S.A. v. Cooper Life Scis.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). Plaintiffs' reliance is misplaced because both of these cases rely on the rejected *Texas Digital* methodology that limits the role of the specification in claim construction. *Phillips*, 415 F.3d at 1313, 1315-17 (role of specification not limited to searching for express definitions and disavowals); *see also Wang Labs.*, 197 F.3d at 1382-83.

### D.  Selector/Settable Element to Select Radio Frequency

Plaintiffs agree that the only dispute here concerns the structure for these terms. There is no dispute that the structure (whatever it may be) must allow the user to select a unique code for wireless communications between detectors. D.I. 141 at 14-15; D.I. 145 at 12. The problem with Plaintiffs' vague construction, aside from conflicting with the patent's express definition, is that Plaintiffs may later use this vagueness to argue that it encompasses software that performs the selection, which is nowhere supported in the '780 patent.

As with the location and language selectors, the only support for these terms in the '780 patent are user-settable hardware switches and jumpers. *See, e.g.*, '780, 5:14-21 ("address code selector *is* a user-set switch") (emphasis added). These terms concern not just how the user sets the circuitry, but also define what those elements are. Plaintiffs' arguments 15 years later about what Dr. Morris understood (D.I. 145 at 12) cannot compensate for the lack of disclosure of software-based selection or refute the sole disclosure of hardware switches and jumpers. The passages Plaintiffs cite provide no support for Plaintiffs' conclusion that the selectors made use of software. D.I. 145 at 12-13. The first passage ('780, 7:30-32) reflects that jumpers and DIP switches (both hardware) may be alternatives to each other, not that there is some other software

7

based alternative. The second passage ('780, 7:47-50) is irrelevant as it discusses the use of a selected coded signal, not how that code is selected. Further, as before with the location and language selection terms, that the "selector" may be used to program something else does not mean that the selector or settable element is itself software as Plaintiffs appear to suggest. D.I. 145 at 12 (citing '780, 6:14-18). Similarly, a generic catch-all statement that alternative arrangements may become obvious to one skilled in the art (D.I. 145 at 12 (citing 8:40-46)) cannot override the rest of the patent disclosure, which clearly limits these selectors or settable elements to hardware. *See Digital Biometrics*, 149 F.3d at 1345.

### E. "Control electronics" / "control element" / "electronic circuit"

Plaintiffs argue that "control electronics/element" and "electronic circuit" are different in an effort to sidestep the main dispute identified by Nest: whether the "control electronics/ element" and "electronic circuit" are hardware rather than software (D.I. 141 at 15). Plaintiffs also misrepresent Nest's construction as limited to a single hardware element (D.I. 145 at 7). Nest's construction resolves Plaintiffs' misguided reference to unrelated functions by focusing on the relevant function of triggering the playing of voice messages and the repeated disclosure of the actual hardware elements within interface and control unit 20 that perform this function. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the specification . . . is the single best guide to the meaning of a disputed term").

Plaintiffs attempt to rely on the encoder and decoder as support for "programmable" in their construction. D.I. 145 at 8. Yet, the very passage Plaintiffs cite explains that these discrete elements are used to encode or decode a signal that addresses the voice memory. *Id.* (citing '310, 6:42-7:3)). There is no disclosure of "programm[ing]" such as software or a programmed processor. Similarly, Plaintiffs' reliance on the purported role of the control unit in "location selection" as support for "programmable circuitry" is likewise misplaced. D.I. 145 at 7 (citing

'310, 6:9-16). This passage explains that a manually settable hardware device (jumper or DIP switch) that is connected to interface and control unit 20 allows for user-selection of location, which is far afield from any disclosure of software or a programmed processor.

There is simply no support for importing "programmable" into the construction of this term. *See* D.I. 145 at 7-8. The only "programmable" element disclosed is voice memory 21 (unrelated to interface and control unit 20), which refers to "pre-programmed" or pre-stored location messages, not programming in the sense of software. '310, 3:19-24. Plaintiffs' only support for "programmable circuitry" comes from improperly elevating extrinsic evidence over the specification by looking up the single word "control" and selecting the only definition (of eight variations) in the IEEE Dictionary that recites a "digital computer." *Phillips*, 415 F.3d at 1317. Thus, Plaintiffs' proposed "programmable circuitry" must be rejected as it risks having the jury misunderstand these terms as somehow referring to software (a program) on a processor.

Plaintiffs' entire argument for treating "control electronics/element" and "electronic circuit" differently rests on the unfounded assertion that Figures 1 and 2 are unrelated. *See* D.I. 145 at 8. Yet, the patent refers to both Figures 1 and 2 as a sketch of the <u>same</u> embodiment ('310, 5:8-11) and Figures 1-3 use common numbering for each of the elements. Figures 2 and 3 simply detail the discrete hardware components within the blocks of Fig. 1. Moreover, the context of the relevant claim language makes clear that "control electronics/element" and "electronic circuit" are interchangeable terms that perform the same function of "triggering the playing of voice messages during silent intervals" and refutes Plaintiffs' disparate treatment of these terms. *See, e.g.*, '798, claim 1, 8:20-38 ("control electronics . . . causes the *selected location message to be repetitively emitted in respective silent intervals*"); '424, claim 7, 9:45-47 ("control element repetitively *injects the stored fire indicating word into only the second time*

*intervals*"); '424, claim 37, 14:5-8 ("electronic circuit repeatedly *verbalizes the . . . location message during . . . the silent periods*") (emphasis added in each). *Curtiss-Wright*, 438 F.3d at 1380 ("two claims with different terminology can define the exact same subject matter"). Nest's proposal of "discrete hardware elements that trigger the playing of voice messages during silent periods" only applies to the identified claim language and captures the relevant functionality to properly aid the fact finder in understanding the term. *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("description of what a component does may . . . aid[] the court and the jury in understanding the term."). Thus, contrary to Plaintiffs' argument (D.I. 145 at 8-9), a construction of this portion of the relevant claims is neither redundant nor does it eliminate functions or features that the claims may further recite for the control electronics.

Plaintiffs correctly identify the general block of Figure 1 (interface and control unit 20) that performs the functions of the "control electronics/element" and "electronic circuit." D.I. 145 at 7. However, Plaintiffs ignore the repeated disclosure of only discrete hardware elements within interface and control unit 20 actually responsible for the relevant function of trigging the playing of voice messages during silent periods: monostable multivibrator 21 and electronic frequency counter. D.I. 141 at 17 (citing '310, 7:8-15; 5:63-6:2, 6:45-61; Figs. 2 and 3); *see also Mass. Inst. of Tech. v. Abacus Software (MIT)*, 462 F.3d 1344, 1356-57 (Fed. Cir. 2006) (limiting "circuit" to hardware where "the specification repeated[ly] descri[bed] the circuit itself as involving hardware"). Plaintiffs also err by relying on *Milwaukee* to suggest that *MIT* is no longer applicable here. D.I. 145 at 10. The *Milwaukee* court construed the words "configured to" as part of a phrase that contained the words "control circuit," but did not construe "control circuit." *Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.*, 2012 U.S. Dist. LEXIS 188112, *18-

20 (E.D. Wis. Dec. 11, 2012). Moreover, whether the patents lacked any disclosure of software pertinent to the recited function as do those here simply was not at issue in *Milwaukee*.

F.   **Wired "interconnecting"**

Although there is no dispute regarding the disavowal of wireless communication between detectors, Plaintiffs ignore the patentee's express disavowal of interconnection through "intervening devices" (D.I. 145 at 11). *See* '424, 3:12-21 ("***present invention*** . . . compris[es] ***direct*** hardwired communication links . . . all without the need of a centralized control unit") (emphasis added); 4:48-49 ("system embodiments of the ***present invention do not require the use of a centralized control unit*** (control panel) ***between detectors***)(emphasis added); *see also Phillips*, 415 F.3d at 1316 ("intentional disclaimer, or disavowal, of claim scope . . . as expressed in the specification, is regarded as dispositive"). Claim 24 confirms that the detectors are interconnected to ***each other*** so they can directly respond to one another. '424, claim 24, 12:1-3 ("interconnected detectors ***respond*** to one detector which is sensing an environmental condition") (emphasis added). During prosecution, the patentee also disclaimed intervening devices between detectors. BRK_000112 (distinguishing Molinick as "centrally controlled"). Thus, this limitation must mean "the detectors have a wired connection ***to each other***" as proposed by Nest.

Claim 24 further recites that the purpose of interconnecting detectors is to transmit alarm signals so "all other interconnected detectors emit substantially the same tonal pattern alarm and pre-recorded voice message." '424, 12:3-5. Because the patent does not contemplate interconnection for any purpose other than transmitting and receiving alarm signals (D.I. 141 at 18), Nest's construction comports with the scope of the patent and will aid the jurors' understanding of this term. *Phillips*, 415 F.3d at 1315; *Funai*, 616 F.3d at 1366.

11

G. **"A processor programmed for retrieving a selected tonal alarm pattern and presenting same to the audible alarm"**

In arguing that the presumption against § 112, ¶ 6 treatment is not overcome for the "processor" terms, Plaintiffs ignore the guidance provided by cases like *Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435, *4-6 (Fed. Cir. Apr. 25, 2014) and *In re Katz Interactive Call Processing Patent*, 639 F.3d 1303, 1315-17 (Fed. Cir. 2011). Instead, Plaintiffs focused on cases that did not involve processors and where, in each case, there was ample structure disclosed for the mechanical claim elements. *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373-74 (Fed. Cir. 2012) ("height adjustment mechanism"); *Lighting World v. Birchwood*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("connector assembly for connecting each pair of adjacent support members [and] being pivotally connected to said pair of adjacent support members"); *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1258-60 (Fed. Cir. 2008) ("holes in said plate providing means for allowing the pin to slide axially therein but preventing compression across the fracture, and stabilizing said near end of the pin against displacement in the plane of plate"). None of these cases is analogous to whether the processor terms here have sufficient structure.

As *In re Katz* (and the cases it cites) make clear, where a means term was used, a processor for performing a specific function that not all processors perform would not be sufficient structure to avoid indefiniteness. *In re Katz*, 639 F.3d at 1315-17. Applying this rationale to the framework set forth in the *Apple* case, the presumption is overcome here because the mere recital of the processor's function in the claim and specification is not structure. *Apple*, 2014 WL 1646435 at *6-9 ("[t]he limitation's operation is more than just its function; it is how the function is achieved"). Plaintiffs' bare assertion that the processor is not devoid of structure (D.I. 145 at 20) cannot be squared with the reasoning of these cases nor the purpose of requiring disclosure of the steps and operations a processor performs to accomplish a function beyond

12

those performed by every processor. *See* D.I. 141 at 19-21.

Plaintiffs' only argument against indefiniteness (if the processor terms are treated as means-plus-function terms) appears to confuse written description with indefiniteness. D.I. 145 at 20. It is irrelevant to indefiniteness whether this claim term was amended. Moreover, as explained above, the claim language "retrieving a selected tonal alarm and presenting same to the audible alarm" recites the function. It provides no insight as to the steps and operations that are performed to accomplish that function, including, for example, how the tonal alarm is selected. The mere disclosure of the outcome, rather than how the outcome was achieved cannot save these claims from indefiniteness. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328, 1334-35 (Fed. Cir. 2008); *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1384-85 (Fed. Cir. 2009) (term indefinite where "ordinarily skilled artisans could carry out the recited function in a variety of ways" but the patent did not disclose the particular structure to do so).

## III.    THE DEVINE PATENT ('182 PATENT)

### A.    "[Substantially] symmetrical in-flow and out-flow"

This term requires construction because there is no basis to conclude that a lay juror would understand this term in a manner consistent with the intrinsic record, particularly in view of the patentee's disavowal and the parties' dispute over the meaning. *O2 Micro*, 521 F.3d at 1361-63; *see also Phillips*, 415 F.3d at 1316.

Plaintiffs quote '182, 3:11-14 (D.I. 145 at 21), but ignore the very next sentence, which says "[n]o special vanes or deflecting elements are required to cause inflow or outflow[] . . . into openings [] of the sensor." '182, 3:14-17. Plaintiffs' effort to avoid the disclaimer of vanes or deflectors inside the housing only confirms that this term should be construed and made consistent with the intrinsic record. D.I. 141 at 22-23. Moreover, the disclaimer is not mere

jargon and there is no reason to believe a jury would have trouble understanding these words as Plainitiffs contend. Further, *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012) is inapplicable because *Thorner* did not involve an assertion that the construction of the term "attached to said pad" was based on an explicit disclaimer.

Plaintiffs' proposal that "the symmetry of the '182 patent is with respect to the <u>housing</u>, not the <u>sensor</u>" (D.I. 145 at 21) conflicts with the words of the claim which require symmetrical flow to and from the sensor. '182, claim 1, 4:23-25 ("substantially *symmetrical* in-flow and out-flow . . . <u>to and from the sensor</u>") (emphasis added); claim 10, 4:54-55 ("*symmetrical* inflow . . . <u>into the sensor</u>") (emphasis added); claim 30, 6:26-28 ("substantially *symmetrical* in-flow and out-flow . . . <u>to and from the sensing region of the sensor</u>") (emphasis added). Moreover, Plaintiffs' argument that the disclaimer applies to airflow within the housing (D.I. 145 at 22), when combined with the language of the claims above that shows the flow being referred to is to and from the sensor (i.e., within the housing), confirms that Nest's construction correctly accounts for this disclaimer.

Plaintiffs' use of "corresponding form" is both confusing and improperly relegates the specification to a secondary role. *Phillips*, 415 F.3d at 1317 & 1320. Plaintiffs' complaint that Nest's use of opposing sides is confusing is particularly odd given that Nest's use of "opposing sides" in its construction is consistent with both the patent (D.I. 141 at 22) and Plaintiffs' own dictionary definition. *See* D.I. 145 at 22 (defining "symmetry" as relating to "*opposite sides* of a boundary, such as a plane or line or around a point or axis") (emphasis added)).

Thus, Nest's proposal should be adopted because it defines the claimed airflow consistent with the intrinsic record, including the patentee's express disavowal of airflow obstructed or redirected by other components, vanes or deflectors, and the common meaning of "symmetrical."

### B. "substantially planar flow path through the housing"

Plaintiffs' proposed "plain meaning" construction ignores the claim language that requires the air flow path to be substantially planar "through the housing" ('182, claim 20, 5:18-21) not just as it enters and exits and must be rejected for that reason alone. *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998). Once again, this claim language, coupled with Plaintiffs' admission that the disclaimer of air flow deflection by other components, vanes or deflectors relates to air flow inside the housing (D.I. 145 at 22), confirms Nest's proposed construction. Moreover, Plaintiffs' brief (including footnotes 7 and 8) is premised on reinterpreting Nest's construction to require planar airflow both around and inside the housing. D.I. 145 at 24-25 & nn. 7-8. Nest's construction refers to the flow paths through the housing as the phrase "through the housing adjacent to the interior surface" would remain unconstrued. The slope of the ceiling is thus irrelevant.

Plaintiffs also baselessly challenge Nest's construction on the grounds that "lie largely in two dimensions" is inconsistent with the claim language and Nest's proposal that the air flow paths "are not vertically deflected or displaced by other components, vanes or deflectors." D.I. 145 at 24. Nest's inclusion of both parts acknowledges the "substantially planar" claim language (and reality that the air flow has a finite thickness (i.e., cannot be zero)) (hence the "lie largely two dimensions), but also accounts for patentee's disavowal of components, vanes and deflectors that would vertically deflect or displace the claimed flow (*see* Section III.A., *supra*). Thus, Nest's proposed construction properly clarifies the meaning of the "substantially planar flow path" consistent with the claim language and what patentee described as its invention. *Renishaw,* 158 F.3d at 1250.

15

DATED: May 16, 2014                         Respectfully submitted,

*/s/ Kevin X. McGann*

Kevin X. McGann (*pro hac vice*)
Jeffrey J. Oelke  (*pro hac vice*)
John P. Scheibeler  (*pro hac vice*)
John P. Padro  (*pro hac vice*)
Vigen Salmastlian  (*pro hac vice*)
White & Case LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

John Letchinger (#6207361)
Frank Blechschmidt (#6308606)
Baker & Hostetler LLP
191 North Wacker Drive
Chicago, IL 60606-1901
(312) 416-6206

*Attorneys for Defendant Nest Labs, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2014, I electronically filed the foregoing **DEFENDANT**

**NEST'S REPLY CLAIM CONSTRUCTION BRIEF** with the Clerk of Court using the CM/ECF

system, which will send notification of such filing to all Counsel of Record.


By:    */s/ Frank Blechschmidt*

Frank Blechschmidt (#6308606)
Baker & Hostetler LLP
191 North Wacker Drive
Chicago, IL 60606-1901
(312) 416-6206

*One of the Attorney for Defendant Nest Labs,*
*Inc.*